1    **WO**                                                                    SC

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Isaac John William Mullins,                No.    CV-25-00162-TUC-SHR

10                        Plaintiff,

11   v.                                          **ORDER**

12   NaphCare Inc., et al.,

13                        Defendants.

14

15          Plaintiff Isaac John William Mullins, who is confined in the Arizona State Prison

16   Complex-Tucson, has filed a pro se civil rights Complaint pursuant to 42 U.S.C.

17   § 1983 (Doc. 1) and an Application to Proceed In Forma Pauperis (Doc. 2).  Plaintiff also

18   filed a motion for leave to exceed the page limit (Doc. 4), a motion for preliminary

19   injunction (Doc. 5), and a motion for service (Doc. 6).  Most recently, Plaintiff has filed a

20   motion for status regarding his motion for preliminary injunction (Doc. 11), which will be

21   granted to the extent addressed herein.  The Court will grant the Application and deny the

22   motion to exceed the page limit as moot.[1]  The Court will require Defendant NaphCare,

23   Defendants Warren, Welch, Ceballos, Thornberry, Flick, Myers, Davie, Germany,

24   Rahman, Omololu, Virgin, and Salazar, in their individual capacities, and Defendant

25   _____

26          [1] The Clerk's Office docketed the motion to exceed as pertaining to the motion for
     a preliminary injunction, lodged the motion for preliminary injunction, and filed the
27   Complaint.  Plaintiff filed a notice (Doc. 10) stating the motion to exceed pertained to his
     Complaint not the motion for a preliminary injunction.  The Clerk's Office modified the
28   docket entry for the motion to exceed to reflect that it pertained to the Complaint and filed
     the motion for preliminary injunction.  Because the Clerk's Office filed the Complaint on
     April 9, the Court will deny the motion to exceed as moot.

Thornell, in his official capacity, to respond to the Complaint and will deny as moot the motion for service. These Defendants will also be required to respond to Plaintiff's motion for preliminary injunction.

**I.      Application to Proceed In Forma Pauperis and Filing Fee**

The Court will grant Plaintiff's Application to Proceed In Forma Pauperis. 28 U.S.C. § 1915(a). Plaintiff must pay the statutory filing fee of $350.00. 28 U.S.C. § 1915(b)(1). The Court will assess an initial partial filing fee of $40.76. The remainder of the fee will be collected monthly in payments of 20% of the previous month's income credited to Plaintiff's trust account each time the amount in the account exceeds $10.00. 28 U.S.C. § 1915(b)(2). The Court will enter a separate Order requiring the appropriate government agency to collect and forward the fees according to the statutory formula.

**II.     Statutory Screening of Prisoner Complaints**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if a plaintiff raises legally frivolous or malicious claims, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1)–(2).

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. *Id.* at 681.

But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A "complaint [filed by a *pro se* prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

## III.    Complaint

In his four-count Complaint, Plaintiff alleges he has been denied constitutionally adequate medical care for his gastrointestinal, neurologic and/or orthopedic, and pulmonary conditions and a state law claim for medical malpractice and failure to train or supervise. Plaintiff sues the Director of the Arizona Department of Corrections, Rehabilitation & Reentry (ADC), Ryan Thornell. Plaintiff also sues NaphCare Health Inc. ("NaphCare"), a private entity contracted with ADC to provide medical care for ADC prisoners, and the following NaphCare employees: Contract Facility Health Administrator (FHA) Jennifer Davie, Contract Assistant Director of Nursing (ADON) Alicia Germany, "Informal Grievance Respondent" Sydney Flick, and "Formal Grievance Respondent" Robin Myers[2]; Nurse Practitioners Shannon Welch, Alice Warren, Christie Thornberry, and Ceballos; Tucson Complex Medical Site Director Abel Salazar; Tucson telehealth physicians Samina A. Rahman and Adeyimika Omololu; and Registered Nurse Virgin. Plaintiff seeks injunctive, compensatory, and punitive relief and his costs for this action.

---

[2] According to Department Order (DO) 802.3.2, the "Contract Assistant Director of Nursing shall" investigate and respond to "Medical Informal Complaint Resolutions[s]." Under DO 802.5.3, "the Contract Director of Nursing shall" investigate and respond to "Formal (medical) Grievances." Under DO 802.8.3 the "Contract Facility Health Administrator shall" respond to prisoner's "Medical Grievance Appeal." *See* https://corrections.az.gov/sites/default/files/documents/policies/800/0802.pdf, at electronic pages 5-6, 8 [https://perma.cc/DEX3-PTWQ].

Plaintiff designates Counts I through III as claims based on a denial of constitutionally adequate medical care.[3]

In **Count I**, Plaintiff alleges the following facts:

In early 2023, Plaintiff began experiencing gastrointestinal (GI) problems, including severe pain or cramps, indigestion, severe bloating, and cycles of constipation and "extreme diarrhea." (Doc. 1 at 5.) While in the prison infirmary between February and June 2023, Plaintiff was prescribed lactulose, Miralax, milk of magnesia, magnesium citrate, Tums, simethicone, colace (a stool softener), Fiber-Lax, and Reglan. Plaintiff's list of "medical problems" in his medical record included constipation, "other" abdominal pain, and "unspecified" abdominal pain. In April 2023, after the above medications failed to resolve Plaintiff's symptoms, a non-party, Dr. Paul, requested authorization from NaphCare for a gastroenterologist consultation. Between April 24 and 28, 2023, Plaintiff was hospitalized for the third time in recent months for a pulmonary embolism. After describing his GI symptoms to a hospital dietician, the dietician recommended that Plaintiff receive nutritional supplements, such as Ensure, to assure that he received adequate nutrition and to minimize his GI symptoms. After Plaintiff returned to prison, Dr. Paul prescribed Ensure for Plaintiff.

On August 28, 2023, Plaintiff met with a non-party gastroenterologist, Dr. Abdul Nadir, who recommended Plaintiff receive Protonix, Miralax, and Metamucil, a colonoscopy, and an esophagogastroduodenoscopy[4] (EGD), and recommended he return in four to six weeks. In mid-September 2023, Plaintiff began to receive Protonix. Prison medical staff disregarded the recommendation for Metamucil.

More than five months after the gastroenterologist's recommendation, Plaintiff was scheduled for a colonoscopy and EGD on February 21, 2024, but the appointment was

---

[3] The Court refers to Plaintiff's allegations in the Complaint, and, where relevant, to medical reports submitted by Plaintiff with his motion for injunctive relief.

[4] A test to examine the lining of the esophagus, stomach, and the first part of the small intestine. *See* https://medlineplus.gov/ency/article/003888.htm [https://perma.cc/6TRL-7N8P].

canceled because prison medical staff had failed to have Plaintiff "properly" prepare for the procedures. (*Id.* ¶ 6.) Two months later, on April 30, 2024, Dr. Nadir performed Plaintiff's colonoscopy and EGD at Mountain Vista Medical Center.

On May 20, 2024, Plaintiff had an appointment with a NaphCare provider regarding his EGD results, which indicated "mild chronic inactive gastritis," "reactive gastropathy,"[5] and "antrum and oxyntic mucosa with changes suggestive of P[roton]P[ump]I[nhibitor] effect."[6] (*Id.* ¶ 13.)

On June 9, 2024, Plaintiff submitted two Health Needs Requests (HNRs) for painful abdominal bloating and "onset of fecal incontinence." He does not allege whether he received a response.

On September 25, 2024, Plaintiff met with Defendant Welch, who prescribed sucralfate, which was later discontinued as ineffective. On October 16, 2024, Defendant Welch met with Plaintiff and told him that she wanted to "table" further treatment of his GI symptoms pending Plaintiff's next gastroenterologist appointment. (*Id.* ¶ 10.)

On October 30, 2024, Plaintiff submitted an HNR to Defendant Welch saying that his GI medications were ineffective and that he continued to suffer pain. Plaintiff does not indicate whether he received a response.

On November 10, 2024, Plaintiff submitted an HNR seeking renewal of his Ensure prescription. Defendant Thornberry denied the HNR stating, "Order has expired and will not be renewed," although the order for Ensure had previously been renewed by six different providers, including Defendant Welch. (*Id.* ¶ 18.) Plaintiff claims Thornberry denied his request as a cost-saving measure. (*Id.* ¶ 20.) Plaintiff filed HNRs on November

---

[5] "Reactive gastropathy is the long-term process of a mucosal injury caused by chronic exposure to irritating substances" that produce a chemical reaction that erodes the stomach lining over time. *See* https://my.clevelandclinic.org/health/diseases/24671-gastropathy [https://perma.cc/7LPA-NEY2].

[6] "Proton pump inhibitors (PPIs) are used worldwide to treat acid-related disorders such as peptic ulcer and gastroesophageal reflux disease and to prevent gastroduodenal injuries due to nonsteroidal anti-inflammatory drugs. However, long-term use can result in "PPI-induced gastric mucosal changes." *See* https://pmc.ncbi.nlm.nih.gov/arti" [https://perma.cc/RS6K-2XJ4].

13 and 26, and December 1 and 15, 2024 seeking an explanation for denial of the supplement, but did not receive responses. (*Id.* ¶ 21.)

On November 25, 2024, Plaintiff had a follow-up appointment with his gastroenterologist, who diagnosed Plaintiff with altered bowel function, irritable bowel syndrome with constipation ("IBS-C"), functional abdominal pain, GERD, and abdominal bloating. The gastroenterologist recommended that Plaintiff be prescribed Linzess and Buspar, and then return in four to six weeks. (*Id.* ¶ 22.) On December 3, 2024, Plaintiff saw Defendant Thornberry, who informed him that NaphCare's Utilization Management team (UM) had approved Buspar and recommended an "alternative treatment plan" (ATP), to Linzess. When Plaintiff asked why Linzess had not been approved, Thornberry told him that Linzess was an expensive medication that insurance companies would not cover. Plaintiff contends Defendant Thornberry accepted and implemented the UM's ATP as a cost-saving measure and that she had the ability to accept or deny the UM's ATP.

On December 5, 2024, Plaintiff submitted an HNR asking to speak to the UM regarding its denial of Linzess and was instead scheduled to see Defendant Thornberry. Plaintiff filed an Informal Complaint Resolution regarding the denial of Linzess. On December 10, 2024, Plaintiff saw Defendant Thornberry and asked to discontinue Buspar because it was ineffective for his GI symptoms. Plaintiff informed Thornberry he was continuing to suffer from painful bloating, upset stomach, diarrhea, and fecal incontinence. Thornberry told Plaintiff he needed to take Buspar for at least 30 days to comply with the ATP, and he had to "play the game," if he eventually wanted to be approved for Linzess. (*Id.* ¶ 28.) Plaintiff contends Thornberry had the ability to prescribe Linzess and address his GI problems but did nothing.

On December 12, 2024, Plaintiff filed an HNR requesting Metamucil and "other medications" to treat his GI symptoms while he awaited approval of Linzess. (*Id.* ¶ 30.) On December 19, 2024, Plaintiff submitted an HNR asking to be prescribed Linzess because he had complied with the UM's ATP to take Buspar.

. . . .

1    On December 23, 2024, Plaintiff saw Defendant Welch and asked her to request

2  Linzess as recommended by his gastroenterologist for IBS-C. Welch consented and said

3  she would "fight" to obtain approval because she agreed that Linzess was the best treatment

4  for his GI symptoms. (*Id.* ¶ 32.) Plaintiff also asked Welch to renew his order for Ensure

5  and reminded her that it had provided some relief from his GI symptoms and had been

6  recommended by the hospital dietician. Welch refused, telling Plaintiff that a "policy

7  change" prevented her from doing so. (*Id.* ¶ 37.) Plaintiff also asked Welch to order

8  Metamucil, but she denied the request "falsely" stating that "security" prevented her from

9  ordering it for him. (*Id.* ¶ 38.) NaphCare's UM again refused to approve Linzess, instead

10  recommending a different ATP, which Plaintiff does not describe. Plaintiff believes

11  Defendant Welch had the authority to reject or appeal the UM's ATP but did not.

12    On January 2, 2025, Plaintiff filed a formal grievance regarding the denial of

13  Linzess. On January 13, 2025, Plaintiff saw Defendant Welch and told her his IBS-C

14  symptoms were continuing. Welch responded that the UM's December 23 ATP was

15  nonsensical, so she had not implemented it. She reiterated her belief that Linzess was the

16  best treatment for his IBS-C symptoms, but did not order Linzess or other treatment.

17  Plaintiff claims Welch had the ability to order "any medication" but did not as a cost-saving

18  measure. (*Id.* ¶ 42.)

19    On January 15, 2025, Plaintiff submitted an HNR again requesting an order for

20  Ensure in light of his worsening symptoms and loss of appetite, which Welch again denied

21  based on a "new policy." (*Id.* ¶ 43.) The same day, Plaintiff submitted an HNR reporting

22  fecal incontinence. On January 23, 2025, Defendant Welch ordered Plaintiff "pull-ups."

23  (*Id.* ¶ 45.) On January 27, 2025, Plaintiff filed a grievance appeal.

24    On February 14, 2025, Defendant Welch requested authorization for a

25  gastrointestinal consult pursuant to the November 25, 2024 recommendation. Plaintiff

26  contends that NaphCare's UM denied the request as a cost-saving measure. Plaintiff

27  contends Welch had the authority to reject the UM's denial of a follow-up but failed to

28  exercise that authority.

On March 5, 2025, Plaintiff filed an HNR addressed to "Naph[C]are Administration" expressing concerns about being treated by Defendants Welch and Thornberry despite having exhausted his grievances against both. (*Id.* ¶ 51.) On March 10, Welch informed Plaintiff "Risk-MD" was reviewing his GI history. (*Id.* ¶ 52.)

On March 13, 2025, Defendant Welch saw Plaintiff and informed him "Risk-MD" planned to place Plaintiff on senna, Pepcid, and a two-week course of antibiotics. Plaintiff began taking these medications on March 17, 2025.

On March 20, 2025, Plaintiff submitted an HNR seeking clarification regarding the diagnosis that prompted the antibiotics prescription, and the adverse reactions he was experiencing as a result of the antibiotics. On March 23, 2025, Plaintiff filed an HNR asking NaphCare for authorization to purchase Ensure and other "specialist-recommended items." On March 25, Plaintiff submitted an HNR to Defendant Welch concerning adverse reactions he was experiencing as a result of the antibiotics and GI medication changes. Plaintiff was scheduled to see Welch on March 28. When Plaintiff saw Welch, she addressed his March 20 and 25 HNRs. Defendant Welch told Plaintiff the antibiotics were prescribed for diverticulitis. Plaintiff reported he felt sick with adverse GI effects since starting the new GI medications but proposed finishing the course of antibiotics to comply with the ATP. Some of Plaintiff's family members told him there were numerous contraindications as to the antibiotics and other medications. Plaintiff contends Welch and Risk-MD should have checked for contraindications.

Plaintiff contends Defendants Thornberry and Welch denied him Linzess, Metamucil, and nutritional supplements, and a follow-up appointment with his gastroenterologist pursuant to a NaphCare practice, pattern, and custom of denying ADC prisoners expensive medications as a cost-saving measure, without considering the welfare of the prisoner, causing him to suffer unnecessarily. He also contends NaphCare failed to generate or implement policies and procedures to guide its providers in implementing or disregarding specialists' recommendations and Defendant Thornell is responsible for authorizing policies at ADC. Plaintiff seeks a preliminary injunction compelling

Defendants Thornell and NaphCare to provide him treatment as recommended by his gastroenterologist.

In **Count II**, Plaintiff alleges the following facts:

Between February and June 2023, Plaintiff began suffering "acute pain" in his neck, which interfered with his sleep, "severely restricted" his range of motion, and exacerbated his pre-existing chronic headaches.  A variety of methods were prescribed by infirmary staff to treat these symptoms.

On October 11, 2023, Plaintiff submitted an HNR seeking treatment for his neck and shoulder pain, noting that he had been provided pain medications while he was in the infirmary, asking to have these medications restarted, and requesting a diagnosis of the cause of his neck and shoulder pain.  In late October, Plaintiff saw Defendant Warren about his neck and shoulder pain.  He told her the Tylenol and lidocaine patches he had been receiving were not alleviating his pain.  Warren accused Plaintiff of malingering and drug-seeking and told him she would not restart or prescribe pain medications but would order x-rays to determine what type of treatment was required.

X-rays were taken on November 6, 2023, and Plaintiff submitted an HNR to Defendant Warren on November 8, 2023.  In this HNR, Plaintiff stated his ongoing pain was severe, sought follow-up on the x-rays, and inquired about an MRI and pain management.  On November 20, 2023, Plaintiff saw Warren.  Warren told him she had not requested x-rays of his cervical spine.[7]  Plaintiff stressed the pain in his shoulders was growing worse, and Tylenol and lidocaine patches were not effective in treating his pain.  Warren again told Plaintiff she thought he was malingering and denied further imaging or treatment.  The next day, Plaintiff filed an HNR "documenting" Warren's unwillingness to treat his medical needs.  (Doc. 1 ¶ 8.)

At some point, Defendant Warren issued an order for physical therapy (PT), which Plaintiff believes was limited to his shoulders.  The first session, on January 5, 2024,

---

[7] Although Plaintiff's allegations are somewhat unclear on this point, it appears that Plaintiff's shoulder was x-rayed.

consisted of a consultation and examination.  The next day, Plaintiff submitted an HNR describing severe pain in his neck and shoulders, which was affecting his sleep and daily activities.  He again requested further imaging, referral to a specialist, or action by Warren to address his pain.  On January 8, 2024, Plaintiff went to PT, but the exercises he was asked to perform aggravated the pain in his neck and shoulders.  He "reminded" the therapist that Warren was not addressing his pain.  (*Id.* ¶ 13.)  On January 11, 2024, Plaintiff submitted another HNR describing "excruciating pain" in his neck and shoulders and again requesting treatment.  (*Id.* ¶ 14.)  Plaintiff returned to PT on January 16, 2024, and told the therapist he experienced increased pain every time he did the exercises and feared further injury.  The therapist decided to stop PT and refer him back to Defendant Warren.  The next day, Plaintiff submitted an HNR citing the therapist's decision to refer him back to Warren for treatment.  Plaintiff asked that Warren act to diagnose and treat his neck and shoulder pain.

On January 23, 2024, Plaintiff submitted another HNR regarding his neck and shoulder pain, asked that Tylenol be discontinued as ineffective, and "documented" Warren's refusal to address his neck and shoulder pain.  (*Id.* ¶ 19.)  On January 29, 2024, Plaintiff submitted another HNR "documenting" Warren's failure to address his neck and shoulder pain.  (*Id.* ¶ 21.)  On February 1, 2024, Plaintiff submitted an urgent request for expedited treatment regarding a general deterioration of his health under Defendant Warren.

Between August 2023 and February 2024, Defendant Virgin triaged HNRs to determine whether a prisoner would be seen by Warren.  (*Id.* ¶ 25.)  Plaintiff submitted dozens of HNRs during this period, and Virgin triaged them without seeing him.  On several occasions, Virgin told Plaintiff he was a "complainer" because of the number of HNRs he submitted.  (*Id.* ¶ 27.)  Plaintiff contends Virgin discarded or denied his HNRs because Virgin believed he was a complainer, and that he suffered unnecessary pain as a result.

On February 5, 2024, Plaintiff met with Defendant Warren.  Warren insisted

Plaintiff be sent to the hospital for "an unrelated neurological evaluation" but refused to address Plaintiff's neck and shoulder pain. (*Id.* ¶ 29.) Plaintiff returned to prison afterward, and that evening, he submitted another HNR stating his neck and shoulder pain still needed to be addressed. The next day, Plaintiff saw Warren again. Warren said she was only seeing him for a "post-hospitalization follow-up" and told him to submit another HNR if he wanted to discuss his neck and shoulder pain.

On February 12, 2024, Plaintiff submitted an informal complaint. In a March 7, 2024 response, Defendant Flick found Plaintiff's informal complaint resolved where he had been approved for a neurology consult for his upper back pain and had had a telemedicine appointment with a chronic-care provider. (Doc. 5 at 29.)

On February 20, 2024, Plaintiff submitted an HNR "documenting months of suffering intense pain and sleep deprivation as a result of untreated neck and shoulder injuries." (Doc. 1 ¶ 34.) On February 26, 2024, Defendant Rahman saw Plaintiff and ordered x-rays of his cervical spine and left shoulder and prescribed him Cymbalta and Flexeril for pain. (*Id.* ¶ 36.) The results of Plaintiff's x-rays revealed mild, multilevel cervical spondylosis, mild disc space narrowing, and degenerative endplate spurs. (Doc. 5 at 38.)

On March 8, 2024, Plaintiff was summoned to the medical department to speak with RN Acosta, who told Plaintiff he would no longer be seen by Warren and all his HNRs would be "processed by 'telemed'" providers. (*Id.*) On March 11, 2024, Plaintiff filed a grievance regarding the denial of treatment of his neck and shoulder pain.

On March 26, 2024, Plaintiff saw Dr. Rahman, who requested an MRI of Plaintiff's cervical spine and renewed prescriptions for Cymbalta and Flexeril. In an April 2, 2024 response to a March 18, 2024 grievance, Defendant Myers stated Plaintiff had a telemed appointment with a provider on March 27, 2024, and the provider had prescribed duloxetine and Flexeril for pain and submitted an MRI consult request that was pending decision. (*Id.* at 30.)

On April 8, 2024, Plaintiff filed an appeal, presumably from the denial of his March

1    18 grievance.  In an April 2, 2024 response, Defendant Davie stated the MRI and neurology

2    results would determine the course of treatment for Plaintiff's cervical pain.  (*Id.* at 31.)

3         Between February 26 and August 8, 2024, Plaintiff submitted at least 15 HNRs

4    regarding his neck and shoulder pain, was seen by five different NaphCare "telemed"

5    providers, and was prescribed four medications (Cymbalta, Flexeril, Tizanidine, and

6    Voltaren) that failed to relieve his pain.  (Doc. 1 ¶ 43.)  On August 8, 2024, Plaintiff had a

7    neurological consult, during which the neurologist recommended a referral to an

8    orthopedist, nerve block injections, gabapentin, and additional imaging.  Plaintiff contends

9    NaphCare's employees disregarded the recommendation for a referral to an orthopedist as

10   a cost-saving measure.  (*Id.* ¶ 45.)  On August 12, 2024, Defendants Welch and Ceballos

11   told Plaintiff he was approved to receive gabapentin and the neurologist's other

12   recommendations were being reviewed; Plaintiff appears to claim the latter statement was

13   a "lie."  (*Id.* ¶ 47.)  Plaintiff began receiving gabapentin a few days later.

14        On September 17, 2024, Plaintiff had a follow-up neurology appointment at which

15   he received two nerve block injections to the back of his head.  The neurologist

16   recommended an increased dose of gabapentin and referral to a pain management specialist

17   for Plaintiff's cervical spine pain.  Unidentified NaphCare staff received the September 17

18   neurological report recommending referral to a pain management specialist.

19        On October 15, 2024, Plaintiff received nerve testing, which revealed left ulnar

20   neuropathy.  On November 5, 2024, Plaintiff underwent MRIs, which revealed spinal canal

21   stenosis, disc bulging, lumbar spine degeneration, and a "focal tear of the anterior superior

22   through anterior glenoid labrum without detachment."  (Doc. 5 at 40.)

23        On November 27, 2024, Plaintiff met with Defendant Omololu, a NaphCare

24   physician, to review his MRI results.  Based upon the results, Omololu said she would

25   request referral to a pain management specialist for his right shoulder and lumbar spine

26   pain.  Plaintiff asserts the NaphCare UM denied Omololu's request to refer him to a pain

27   management specialist as a cost-saving measure and that Omololu accepted an ATP from

28   the UM but failed to implement it.  (*Id.* ¶ 53.)

**TERMPSREF**

On December 18, 2024, Plaintiff had a neurological follow-up to review his diagnostic testing reports, and the neurologist recommended referrals to a pain management specialist and orthopedist for his cervical spine, a hand specialist for his ulnar neuropathy, and an orthopedist for his right shoulder and lumbar spine. The neurologist also recommended "another gabapentin titration," an eggcrate mattress, and a follow-up appointment. (*Id.* ¶ 55.) On December 19, 2024, Defendant Welch met with Plaintiff to review the neurologist's report. Welch told Plaintiff she would increase his gabapentin dosage and inquire about getting him an eggcrate mattress. Plaintiff asserts Welch denied the other recommendations as a cost-saving measure. (*Id.* ¶ 58.) On January 23, 2025, Welch saw Plaintiff again and told him NaphCare's UM had decided to forego a follow-up appointment with the neurologist. (*Id.* ¶ 59.) Plaintiff asserts Welch implemented "the above ATP" as a cost-saving measure, despite her knowledge that he was suffering unnecessarily. (*Id.* ¶ 60.)

On January 30, 2025, Plaintiff was transported to a pain management specialist appointment but could not receive the scheduled cervical spine epidural because NaphCare employees had not properly prepared him for the procedure or provided his MRI report to the specialist.

On February 4, 2025, Plaintiff submitted an HNR regarding pain in his lumbar spine and on February 6, 2025, Defendant Welch met with him and told him she would submit a a pain management specialist referral for treatment of his *lumbar* spine. Plaintiff claims Welch did not do so as a cost-saving measure.

On March 18, 2025, Plaintiff saw an orthopedist regarding his left arm and hand and the orthopedist recommended surgery to treat Plaintiff's left arm and hand. Plaintiff claims NaphCare received notice of the orthopedist's recommendations. On March 20, 2025, Plaintiff submitted an HNR requesting his PT be stopped because of pain and for neurological reasons. On March 22, 2025, Plaintiff submitted an HNR stating severe cervical spine pain was interfering with his sleep. (*Id.* ¶ 69.) On March 24, 2025, Plaintiff

submitted another HNR regarding "numerous ongoing neuro symptoms" and requested a neurologist referral. (*Id.* ¶ 71.) Plaintiff did not receive a response to the March 24 HNR.

On March 28, 2025, Defendant Welch saw Plaintiff regarding his March 22, 2025 HNR. Welch agreed to the request and told Plaintiff she had reviewed his March 18, 2025 orthopedic report; she had submitted a "cubital tunnel" surgery request, presumably to NaphCare's UM; and his cervical spinal epidural appointment had not been rescheduled. (*Id.*)

Plaintiff contends Defendant Warren denied him treatment because she thought he was malingering; Defendant Virgin refused to schedule him to see Warren because she thought he was complainer; NaphCare had a practice, pattern, and custom of denying specialists' recommended treatments and referrals as cost-saving measures and failed to implement affirmative policies and procedures regarding approval and implementation of specialists' recommendations; and Defendants Welch, Ceballos, and Omololu denied him access to specialists and recommended care.

In **Count III**, Plaintiff alleges the following:

Between November 9, 2022, and January 25, 2023, Plaintiff was twice hospitalized for pulmonary embolism and subsequently diagnosed with pulmonary arterial hypertension, which his pulmonologist explained could be "very detrimental" to his health. (Doc. 5 ¶ 41.) Between April 24 and 28, 2023, Plaintiff was hospitalized a third time for pulmonary embolism. On May 9, 2023, Plaintiff saw his pulmonologist, who ordered Plaintiff receive supplemental oxygen with physical activity.

In June 2023, Plaintiff's lung diagnosis was modified to "chronic thromboembolic pulmonary hypertension" (CTEPH), a rare form of pulmonary arterial hypertension. (Doc. 1 ¶ 7.) His pulmonologist informed Plaintiff CTEPH had high morbidity and mortality, and, if mismanaged, could result in permanent organ damage, heart failure, cognitive decline, and premature death. (Doc. 5 ¶ 72.)

On August 17, 2023, Plaintiff saw his pulmonologist, who issued an order for supplemental oxygen when sleeping and with physical activity.

On October 15, 2023, Plaintiff saw his pulmonologist again and performed a walking test, during which Plaintiff's oxygen levels dropped.  The pulmonologist asked Plaintiff about his oxygen usage, and Plaintiff told the pulmonologist the oxygen tanks he had been provided were heavy and cumbersome, and "severely limited" his physical activity and quality of life.  (Doc. 1 ¶ 9.)  Plaintiff added he had to "constantly maneuver" and that the maneuvering exacerbated his chronic neck and shoulder pain.  (*Id.*)  The pulmonologist stated in bold print Plaintiff "should have access to small, portable oxygen [concentrator]," such as ones made by Inogen.[8]

Plaintiff contends Defendant Warren received the pulmonology report and "chose to ignore" the recommendation for a portable oxygen concentrator as a cost-saving measure.  (*Id.* ¶ 10.)  At a late October 2023 appointment, Plaintiff told Defendant Warren the oxygen tank was unwieldy, exacerbating his neck and shoulder pain and discouraging him from using it.

On December 15, 2023, Plaintiff saw his pulmonologist again and performed a six-minute walking test.  The pulmonologist repeated his prior recommendations for supplemental oxygen during activity, apparently including use of a portable oxygen concentrator.

On January 21 and 29 and February 1, 2024, Plaintiff submitted HNRs inquiring about a portable oxygen concentrator.  On February 5, 2024, Defendant Warren "falsely" informed Plaintiff she had requested authorization for a portable oxygen concentrator for Plaintiff.  Plaintiff submitted additional HNRs seeking confirmation Warren had requested a portable oxygen concentrator, but he did not receive a response.

At a February 26, 2024, telemedicine appointment with Defendant Rahman, Plaintiff told Rahman his pulmonologist had recommended a portable oxygen concentrator

---

[8]    *See*    https://www.inogen.com/?srsltid=AfmBOoqLQKAJBD3lnoBOwbird ftlfrxr61v4UC8syVuQsGsMQS26ZXPP [https://perma.cc/N59N-NWJJ].    According to one site, portable oxygen concentrators range in price from $1,500 to $2,600, excluding related supplies such as tubing, a carrying strap, and carrying bag.  *See e.g.* https://www.theseniorlist.com/portable-oxygen-concentrator/inogen/ [https://perma.cc/Y5P8-E88G].

for him on October 15, 2023.  Plaintiff also told Rahman of his increased neck and shoulder pain from having to maneuver an oxygen tank on the yard, which in turn had "severely limited" his physical activity.  (*Id.* ¶ 19.)  Rahman reviewed the pulmonologist's recommendation and said she would order a portable oxygen concentrator because it was appropriate for Plaintiff's conditions.

On April 3, 2024, Plaintiff submitted an HNR because he had not received a portable oxygen concentrator.  Plaintiff did not receive a response.

On April 11, 2024, Plaintiff filed an informal complaint regarding NaphCare employees' failure to comply with the pulmonologist's recommendation to provide a portable oxygen concentrator.  (*Id.* ¶ 22.)  On April 23, 2024, Plaintiff had a telemedicine appointment with Defendant Rahman, who told him he no longer qualified for supplemental oxygen during physical activity.  According to Plaintiff, Rahman's "new opinion" was not based on an examination or test results, was contrary to his pulmonologist's "standing order" that he continue to use supplemental oxygen during physical activity, and was an attempt to reduce costs.  (*Id.* ¶¶ 16, 24.)

On April 29, 2024, Plaintiff had another telemedicine appointment with Defendant Rahman.  Plaintiff asked Rahman why he had not been receiving treatment recommended by specialists.  Rahman told him she believed all his issues were psychological, rather than physical, despite the diagnoses of his treating specialists.  Rahman did not schedule a mental health evaluation.

On May 2, 2024, Defendant Flick denied Plaintiff's April 11 informal complaint, stating that on April 23, Rahman had discussed with Plaintiff his pulmonology results, including the results of a walking test in which Plaintiff had walked 1,650 feet on "room air" and which established he did not qualify for supplemental oxygen during ambulation. (Doc. 5 at 32.)  Plaintiff contends Flick chose not to investigate his "claim" for a portable oxygen concentrator and instead followed NaphCare's practice, pattern, and custom of denying medical treatment and equipment as a cost-saving measure.

On May 8, 2024, Plaintiff submitted a grievance.  On May 15, 2024, Plaintiff

submitted an HNR "documenting" the lack of treatment by Rahman.  Plaintiff did not receive a response to the HNR.

On May 20, 2024, Defendant Myers denied Plaintiff's grievance.  Myers noted the results of Plaintiff's walking test indicated he did not qualify for a portable oxygen concentrator during ambulation and stated he would continue to receive supplemental oxygen at night.  (Doc. 5 at 33.)  Plaintiff contends Defendant Myers "chose not to investigate" Defendant Rahman's denial of a portable oxygen concentrator pursuant to NaphCare's practice, pattern, and custom of denying treatment based on cost.  (Doc. 1 ¶ 34.)  On June 3, 2024, Plaintiff submitted a grievance appeal.

On June 7, 2024, Plaintiff reviewed his medical records and saw his pulmonologist's December 15, 2023 report recommending he continue using supplemental oxygen with physical activity, which he contends was contrary to what Defendants Rahman, Flick, and Myers told him.  Plaintiff contends they read his pulmonologist's report and knew he needed supplemental oxygen with physical activity.  Plaintiff does not allege whether he was then using supplemental oxygen, via an oxygen tank, when active or only at night.

On June 9, 2024, Plaintiff submitted an HNR asking NaphCare staff to conduct a six-minute walking test and check his oxygen levels, as had been done at his pulmonology clinic, to assess his pulmonary health.  On June 10, 2024, Plaintiff saw Defendant Omololu, who told Plaintiff NaphCare staff did not conduct walking tests.  On June 12, 2024, Plaintiff submitted an informal complaint against Defendants Rahman, Flick, and Myers for dishonesty and deception in denying him a portable oxygen concentrator.

On June 13, 2024, Plaintiff had a follow-up with his pulmonologist and told the pulmonologist about his difficulties in receiving recommended pulmonology care.  The pulmonologist recommended Plaintiff be referred to a cardiopulmonology rehabilitation center.  Plaintiff contends NaphCare received the recommendation and "chose to disregard it." (*Id.* ¶ 42.)  On July 29, 2024, Plaintiff filed a grievance regarding Rahman, Flick, and Myers.  On August 26, 2024, Plaintiff filed a grievance appeal.

On September 16, 2024, Plaintiff had another appointment with his pulmonologist, who made a second referral for cardiopulmonary rehabilitation, issued a "reminder" that Plaintiff was to continue using oxygen with physical activity, recommended an echocardiogram be performed in October, requested a post-echocardiogram appointment in November to go over the results and perform a distance walking test, stated Plaintiff needed to have access to a pulse oximeter to monitor oxygen levels, and Plaintiff should use supplemental oxygen when his oxygen levels were 88% or lower. Plaintiff contends NaphCare staff disregarded the pulmonologist's recommendations for cardiopulmonary rehabilitation, a pulse oximeter, and a follow-up appointment with the pulmonologist.

On September 18, 2024, Plaintiff saw Defendant Welch and Plaintiff asked that a pulse oximeter be ordered. Welch reviewed the pulmonologist's report, agreed a pulse oximeter was appropriate, and said she would order one. Plaintiff met with Welch again on September 25, 2024, and asked about the pulse oximeter. Welch told Plaintiff Defendant Salazar had denied the request. Plaintiff contends Salazar denied the pulse oximeter as a cost-saving measure and Welch "accepted and failed to implement an inapplicable ATP for the oximeter at the behest" of Salazar. (*Id.* ¶ 52.) On September 25, 2024, Plaintiff submitted an informal complaint for denial of the oximeter.

On October 3, 2024, Plaintiff met with Defendant Thornberry and asked why he had been denied a pulse oximeter. Thornberry "falsely" stated ADC policy prohibited pulse oximeters because they contained batteries, which posed a security risk. Plaintiff responded the commissary sold batteries to prisoners. Plaintiff appears to contend Defendant Thornell implemented a policy to deny Plaintiff a pulse oximeter on the false ground that it posed a security risk.

On October 9, 2024, Plaintiff submitted inmate letters inquiring which entity—NaphCare or ADC—was responsible for the denial of a pulse oximeter. Plaintiff received no response.

On October 21, 2024, Plaintiff received a response to his inmate letter from Defendant Germany. Defendant Germany stated in part that provision of a pulse oximeter

posed a security risk, and that because the Manzanita Unit had 24-hour yard access, Plaintiff could go to the medical department to have his oxygen saturation levels checked. (Doc. 5 at 35.)

In late October, Plaintiff spoke to non-party Captain Dutcher, who told Plaintiff no policy existed prohibiting "medical equipment or medication," but NaphCare staff had to make a request for medical equipment and unit security would approve or deny the request. Dutcher stated he had not received a request to approve a pulse oximeter for Plaintiff and NaphCare staff had made no such request. On November 4, 2024, Defendant Welch met with Plaintiff and told him NaphCare administrators had decided to reject the pulmonologist's recommendation for a follow-up appointment. Welch stated she disagreed with the decision "because she was not qualified to treat [his] CTEPH condition." (*Id.* ¶ 64.) Plaintiff contends Welch failed to request a follow-up with his pulmonologist as a cost-saving measure. On November 22, 2024, Plaintiff filed a grievance appeal regarding the denial of a pulse oximeter.

On January 31, 2025, Plaintiff submitted an inmate letter asking to meet with Defendants Davie and Salazar "in an attempt to avoid litigation." Plaintiff contends Davie received the Inmate Letter but chose not to respond or resolve Plaintiff's complaints.

Plaintiff contends NaphCare had a practice, pattern, and custom of denying specialist recommendations as a cost-saving measure; Defendant Thornell had a policy of denying Plaintiff a pulse oximeter; Defendants Warren, Rahman, Flick, Myers, and Davie denied Plaintiff a portable oxygen concentrator thereby exacerbating Plaintiff's neck and shoulder pain and limiting his physical activity; Defendants Thornberry, Salazar, Germany, Welch, and Davie denied him a pulse oximeter as a cost-saving measure; and Welch and Davie denied him a follow-up appointment with a pulmonologist to reduce costs and avoid additional recommendations.

In **Count IV**, Plaintiff alleges a claim for medical malpractice and failure to supervise based upon the facts alleged in Counts I through III. Plaintiff also alleges the following:

Defendants NaphCare and Salazar failed to train and supervise their subordinates regarding when and how to follow specialist recommendations. As a result, Plaintiff was denied Linzess, Metamucil, nutritional supplements, a portable oxygen concentrator, a pulse oximeter, cardiopulmonology rehabilitation, pain management, referral to and/or follow-up visits with certain medical specialists (orthopedist, pulmonologist, neurologist, gastroenterologist) and nerve entrapment surgery, which caused him to suffer GI symptoms and pain; neck, arm, and shoulder pain; severe headaches; occipital neuralgia; shortness of breath, dizziness, and other neurological symptoms. Defendant Warren denied him treatment and imaging of his cervical spine and disregarded his pain; Defendant Virgin refused to schedule Plaintiff to be seen by Warren and thereby prevented him from obtaining treatment; Defendant Rahman denied him a portable oxygen concentrator; and Defendant NaphCare's employees failed to prepare Plaintiff for his pain management specialist appointment and send records to the pain management specialist because NaphCare had failed to train them.

## IV.  Claims for which an Answer Will Be Required

### A.  Counts I through III

To prevail in a § 1983 claim, a plaintiff must show (1) acts by the defendants (2) under color of state law (3) deprived him of federal rights, privileges or immunities and (4) caused him damage. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163–64 (9th Cir. 2005) (quoting *Shoshone-Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994)). In addition, a plaintiff must allege that he suffered a specific injury as a result of the conduct of a particular defendant and he must allege an affirmative link between the injury and the conduct of that defendant. *Rizzo v. Goode*, 423 U.S. 362, 371–72, 377 (1976).

In his three federal counts, Plaintiff seeks relief for denial of constitutionally adequate medical care. Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment. To state a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the

condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment, or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Plaintiff sufficiently alleges facts to state Eighth Amendment medical claims against Defendants Warren, Welch, Ceballos, Thornberry, Flick, Myers, Davie, Germany,

Rahman, Omololu, Virgin, and Salazar, in their individual capacities, and Defendant Thornell, in his official capacity, for refusing to schedule Plaintiff to see a specialist (including an orthopedist, pain management specialist, gastroenterologist, neurologist, and pulmonologist) for medical conditions and/or disregarding treating specialists' recommendations (including Linzess, a portable oxygen concentrator, a pulse oximeter, and left arm and hand surgery) pursuant to a policy, practice, or custom of Defendant NaphCare.  These Defendants must respond to Counts I through III.

### B.    State Law Claim

In Count IV, Plaintiff asserts a state law claim for medical malpractice and failure to supervise.  The Court will require all Defendants except Thornell to respond to Count IV.

## VI.    Motion for Preliminary Injunction

Plaintiff seeks a preliminary injunction to require compliance by NaphCare and its named staff with his specialists' recommendations.  Defendants Thornell and NaphCare will be required to respond to Plaintiff's motion for a preliminary injunction.

## V.    Warnings

### A.    Release

If Plaintiff is released while this case remains pending, and the filing fee has not been paid in full, Plaintiff must, within 30 days of his release, either (1) notify the Court that he intends to pay the unpaid balance of his filing fee within 120 days of his release or (2) file a non-prisoner application to proceed in forma pauperis.  Failure to comply may result in dismissal of this action.

### B.    Address Changes

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure.  Plaintiff must not include a motion for other relief with a notice of change of address.  Failure to comply may result in dismissal of this action.

. . . .

**C.     Copies**

Plaintiff must serve Defendants, or counsel if an appearance has been entered, a copy of every document he files.  Fed. R. Civ. P. 5(a).  Each filing must include a certificate stating a copy of the filing was served.  Fed. R. Civ. P. 5(d).  Also, Plaintiff must submit an additional copy of every filing for use by the Court.  *See* LRCiv 5.4.  Failure to comply may result in the filing being stricken without further notice to Plaintiff.

**D.     Possible Dismissal**

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice.  *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1260–61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

**IT IS ORDERED:**

(1)     Plaintiff's Application to Proceed In Forma Pauperis (Doc. 2) is **granted**.

(2)     As required by the accompanying Order to the appropriate government agency, Plaintiff must pay the $350.00 filing fee and is assessed an initial partial filing fee of $40.76.

(3)     Plaintiff's motion to exceed the page limit (Doc. 4) for his Complaint is **denied** as moot.

(4)     The motion for service (Doc. 6) is **denied** as moot.

(5)     If Plaintiff attempts to amend the Complaint, the amended complaint must be filed on the court-approved form and retyped or rewritten in its entirety (including those claims and Defendants that were not dismissed), and Plaintiff must comply with Rule 15 of the Federal Rules of Civil Procedure and Rule 15.1 of the Local Rules of Civil Procedure.

(6)     Defendant NaphCare; Defendants Warren, Welch, Ceballos, Thornberry, Flick, Myers, Davie, Germany, Rahman, Omololu, Virgin, and Salazar, in their individual capacities; and Defendant Thornell, in his official capacity, must answer the Complaint.

(7)     Defendants NaphCare and Thornell must respond to Plaintiff's motion for a

preliminary injunction no later than **20 days** following the filing of a waiver or service of the Complaint.

(8)      The Clerk of Court must send Plaintiff a service packet including the Complaint (Doc. 1), this Order, and both summons and request for waiver forms for Defendants NaphCare, Warren, Welch, Ceballos, Thornberry, Flick, Myers, Davie, Germany, Rahman, Omololu, Virgin, Salazar, and Thornell.

(9)      Plaintiff must complete[9] and return the service packet to the Clerk of Court within 21 days of the date of filing of this Order.  The United States Marshal will not provide service of process if Plaintiff fails to comply with this Order.

(10)      If Plaintiff does not either obtain a waiver of service of the summons or complete service of the Summons and Complaint on a Defendant within 90 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served.  Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(ii).

(11)      The United States Marshal must retain the Summons, a copy of the Complaint, a copy of the motion for preliminary injunction (Doc. 5), and a copy of this Order for future use.

(12)      The United States Marshal must notify Defendants of the commencement of this action and request waiver of service of the summons pursuant to Rule 4(d) of the Federal Rules of Civil Procedure.  The notice to Defendants must include a copy of this Order.

(13)      A Defendant who agrees to waive service of the Summons and Complaint must return the signed waiver forms to the United States Marshal, not the Plaintiff, **within 30 days of the date of the notice and request for waiver of service** pursuant to Federal Rule of Civil Procedure 4(d)(1)(F) to avoid being charged the cost of personal service.

---

[9] If a Defendant is an officer or employee of the Arizona Department of Corrections, Rehabilitation & Reentry, Plaintiff must list the address of the specific institution where the officer or employee works.  Service cannot be effected on an officer or employee at the Central Office of the Arizona Department of Corrections, Rehabilitation & Reentry unless the officer or employee works there.

(14)    The Marshal must immediately file signed waivers of service of the summons.  If a waiver of service of summons is returned as undeliverable or is not returned by a Defendant within 30 days from the date the request for waiver was sent by the Marshal, the Marshal must:

> (a)    personally serve copies of the Summons, Complaint, motion for preliminary injunction, and this Order upon Defendant pursuant to Rule 4(e)(2) or Rule 4(h)(1) of the Federal Rules of Civil Procedure; and

> (b)    within 10 days after personal service is effected, file the return of service for Defendant, along with evidence of the attempt to secure a waiver of service of the summons and of the costs subsequently incurred in effecting service upon Defendant.  The costs of service must be enumerated on the return of service form (USM-285) and must include the costs incurred by the Marshal for photocopying additional copies of the Summons, Complaint, motion for preliminary injunction (Doc. 5), and this Order and for preparing new process receipt and return forms (USM-285), if required.  Costs of service will be taxed against the personally served Defendant pursuant to Rule 4(d)(2) of the Federal Rules of Civil Procedure, unless otherwise ordered by the Court.

(15)    Defendants must answer the Complaint or otherwise respond by appropriate motion within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

(16)    Any answer or response must state the specific Defendant by name on whose behalf it is filed.  The Court may strike any answer, response, or other motion or paper that does not identify the specific Defendant by name on whose behalf it is filed.

(17)    Plaintiff's motion for status (Doc. 11), captioned as a motion for clarification, is **granted** to the extent discussed herein.

Dated this 12th day of June, 2025.

Honorable Scott H. Rash
United States District Judge