1  **WO**                                                                    MGD

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Isaac John William Mullins,                    No. CV-25-00162-TUC-SHR

10                          Plaintiff,

11  v.                                              **ORDER**

12  NaphCare Health Inc., et al.,

13                          Defendants.

14

15          Plaintiff Isaac John William Mullins, who is currently confined in the Arizona State

16  Prison Complex-Tucson, filed this pro se civil rights action pursuant to 42 U.S.C. § 1983.

17  Before the Court are Plaintiff's Motion for Preliminary Injunction (Doc. 5) and Motion to

18  Supplement Reply (Doc. 65).

19  **I.    Background**

20          Plaintiff's Complaint alleges Defendants failed to provide adequate medical care for

21  his gastrointestinal (GI) issues (Count One), ongoing pain and neurological issues (Count

22  Two), and pulmonary/cardiac issues (Count Three).[1]  (Doc. 1.)  Plaintiff alleges Defendants

23  have refused to schedule him to see specialists for his medical conditions and/or have

24  disregarded specialists' recommendations for treatment pursuant to a policy, practice, or

25  custom of Defendant NaphCare.

26

27  _____

28          [1] Plaintiff has filed several other motions, including a motion for leave to file an
    amended complaint (Doc. 30).  The Court will address those motions by separate order(s).

On screening under 28 U.S.C. § 1915A(a), the Court determined Plaintiff had stated Eighth Amendment medical care claims in Counts One, Two, and Three against Defendants NaphCare and Arizona Department of Corrections Rehabilitation and Reentry (ADCRR) Director Ryan Thornell, in his official capacity, and against the following Defendants in their individual capacities: Nurse Practitioners Alice Warren, Shannon Welch, Christie Thornberry, and Unknown Ceballos; Registered Nurse Unknown Virgin; Grievance Responders Sydney Flick and Robin Myers; Facility Health Administrator Jennifer Davie; Assistant Director of Nursing Alicia Germany; Medical Directors Drs. Samina Rahman and Adeyimika Omololu; and Site Medical Director Abel Salazar. (Doc. 12.)  The Court further determined Plaintiff had stated a state law claim in Count Four for medical malpractice and failure to supervise against all Defendants except Thornell.

The Court directed Defendants to answer the claims against them and directed Defendants NaphCare and Thornell to respond to Plaintiff's Motion for Preliminary Injunction for immediate medical care once they had been served.  (*Id.*)  Defendants NaphCare and Thornell filed their response to Plaintiff's Motion for Preliminary Injunction on August 28, 2025, and, due to service issues with Defendants' Response, Plaintiff filed his Reply on November 5, 2025, and a supplement to his reply on November 14, 2025.[2] (Docs. 36, 60, 65.)

## II.    Legal Standards

### A.    Injunctive Relief

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (stating "[a] preliminary injunction is an extraordinary remedy never awarded as of right").  Nonetheless, "federal courts 'must not shrink from their obligation

---

[2] The Court will grant Plaintiff's Motion to Supplement his Reply (Doc. 65) with evidence he says was not available to him when he filed his Reply the week before.

to enforce the constitutional rights of all persons, including prisoners'" and must not "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (quoting *Brown v. Plata*, 563 U.S. 493, 511 (2011)).

A plaintiff seeking a preliminary injunction must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. When the government opposes a preliminary injunction, "[t]he third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry." *Porretti*, 11 F.4th at 1050. The "balance of equities" concerns the burdens or hardships to a prisoner complainant compared with the burden on the government defendants if an injunction is ordered. *Id.* The public interest mostly concerns the injunction's impact on nonparties rather than parties. *Id.* Regardless, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (citation omitted).

The Ninth Circuit has articulated an alternate formulation of the *Winter* test referred to as the "serious questions" or "sliding scale" approach: a preliminary injunction is appropriate if a plaintiff can show "serious questions going to the merits," "the balance of hardships tips sharply in the plaintiff's favor," and the other two *Winter* factors are satisfied. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (explaining "the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test"). Under this "serious questions" version of the sliding-scale test, the elements of the preliminary-injunction test are balanced such that a stronger showing of one element may offset a weaker showing of another. *See id.* at 1135.

Where a plaintiff seeks a mandatory injunction rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017)

1   (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879

2   (9th Cir. 2009)).  "This standard does not supersede the Ninth Circuit's 'serious questions'

3   test.  Rather, the severity of the legal questions correlates with a movant's likelihood of

4   success; the greater the likelihood of success, the less doubtful the case." *Morrar v. United*

5   *States*, No. 2:19-cv00833-KJM-KJN, 2019 WL 2715618, at *4 (E.D. Cal. June 28, 2019).

6          Under the Prison Litigation Reform Act, injunctive relief must be narrowly drawn

7   and be the least intrusive means necessary to correct the harm.  18 U.S.C. § 3626(a)(2); *see*

8   *Gilmore v. California*, 220 F.3d 987, 999 (9th Cir. 2000).

9          When evaluating the merits of a preliminary-injunction motion, a court's factual

10  findings and legal conclusions are not binding at a trial on the merits.  *Univ. of Texas v.*

11  *Camenisch*, 451 U.S. 390, 395 (1981).

12         **B.    Eighth Amendment**

13         To support a medical care claim under the Eighth Amendment, a prisoner must

14  demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d

15  1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There

16  are two prongs to the deliberate-indifference analysis: an objective standard and a

17  subjective standard.  First, a prisoner must show a "serious medical need." *Id.*  A "'serious'

18  medical need exists if the failure to treat a prisoner's condition could result in further

19  significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*,

20  974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v.*

21  *Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  Examples of indications a prisoner

22  has a serious medical need include "[t]he existence of an injury that a reasonable doctor or

23  patient would find important and worthy of comment or treatment; the presence of a

24  medical condition that significantly affects an individual's daily activities; or the existence

25  of chronic and substantial pain." *Id.* at 1059–60.

26         Second, a prisoner must show the defendant's response to that need was deliberately

27  indifferent. *Jett*, 439 F.3d at 1096.  To show deliberate indifference, a plaintiff "must show

28  . . . the course of treatment the doctors chose was medically unacceptable under the

circumstances" and the defendants "chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (citation omitted). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt*, 865 F.2d at 200 (stating delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

## III. Plaintiff's Motion for Preliminary Injunction

Plaintiff's Motion seeks an order requiring Defendants to provide him with various medications, equipment, surgery, and specialist appointments for his GI, orthopedic, neurological, and pulmonary/cardiac issues. (Doc. 5-1 at 1–2.)

### A. Pulmonary/Cardiac Issues

#### 1. Relevant Facts

On June 13, 2024, Plaintiff saw pulmonologist Dr. Ramit Sharma, MD, for a follow-up appointment. Dr. Sharma diagnosed Plaintiff with dyspnea, a history of acute pulmonary emboli, "[r]epeat pulmonary embolus, January 2023 (was taking Eliquis 5 mg [(milligrams)] PO BID at the time)," and "Pulmonary HTN [(hypertension)], WHO Group IV." (Doc. 36-2 at 41.) Plaintiff had 13 medications on his list of current medications,

including Opsumit, Adempas, and Eliquis.[3]  (*Id*. at 40.)  Dr. Sharma's plan of care was to "continue with current therapy," supplement Plaintiff's "oxygen at night continuously," have him enroll in cardiopulmonary rehab so he "knows the exercise routines," and return for a follow-up visit in 3 months.  (*Id*.)  In Plaintiff's history, Dr. Sharma noted Plaintiff "does not require supplemental oxygen during the day but he will require supplemental oxygen continuously during the night.  As for active exercises, [Plaintiff] can do slow cardio exercises."  (*Id*. at 40.)  Plaintiff was not sent for cardiopulmonary rehabilitation. (Pl. Decl. (Doc. 5 at 14–22) ¶¶ 38, 39.)

On September 16, 2024, Plaintiff saw DNP Chandra Sorrelle at Sonoran Pulmonology for a three-month follow-up appointment.  (Doc. 36-2 at 42, 44.)  Plaintiff reported he had been feeling better overall since he began taking Adempas and Opsumit several months earlier and felt better having supplemental oxygen at night.  (*Id*. at 43.) Sorrelle determined Plaintiff had chronic respiratory failure with hypoxia, pulmonary arterial hypertension, and pulmonary embolism.  (*Id*. at 44.)  Sorrelle's plan of care for Plaintiff's pulmonary arterial hypertension was to "[r]epeat 2D echo[cardiogram] in October to monitor RVSP [(right ventricular systolic pressure)]," continue Adempas and

---

[3] Opsumit—the brand name for Macitentan—"treats symptoms of pulmonary arterial hypertension, which is high blood pressure in the main artery that carries blood from the right side of the heart (the ventricle) to the lungs."  Mayo Clinic, *Macitentan (oral route)*, at https://www.mayoclinic.org/drugs-supplements/macitentan-oral-route/description/drg-20061394 (permalink: https://perma.cc/HT8Q-TPS8).

Adempas is the brand name for Riociguat, which "is used to treat adults with chronic thromboembolic pulmonary hypertension (CTEPH) that can be treated with surgery, or that cannot be treated with surgery."  Mayo Clinic, *Riociguat (oral route)*, at https://www.mayoclinic.org/drugs-supplements/riociguat-oral-route/description/drg-20061342 (permalink: https://perma.cc/KUD4-DZ5B).

Eliquis is the brand name for Apixaban, which "is used to treat or prevent deep venous thrombosis, a condition in which harmful blood clots form in the blood vessels of the legs.  These blood clots can travel to the lungs and can become lodged in the blood vessels of the lungs, causing a condition called pulmonary embolism."  Mayo Clinic, *Apixaban (oral route)*, at https://www.mayoclinic.org/drugs-supplements/apixaban-oral-route/description/drg-20060729 (permalink: https://perma.cc/4GES-GDA5).

Opsumit, and have Plaintiff participate in the recommended cardiopulmonary rehabilitation. (*Id.*) For chronic respiratory failure with hypoxia, Sorrelle planned for Plaintiff to continue supplemental oxygen at night and recommended Plaintiff have supplemental oxygen available during the day "as his SpO2 [(saturation of peripheral oxygen)] is likely dropping to 88% or lower when engaging in activity for longer than 6 minutes; especially when outside." (*Id.*) Sorrelle also noted Plaintiff needed access to a pulse oximeter to monitor his "SpO2 as he needs to use supplemental oxygen when 88% or lower." (*Id.*) Sorrelle said Plaintiff was to follow up in November for a "2D echo[cardiogram] & Distance walk." (*Id.*) At the appointment, Plaintiff told Sorrelle he had not been to cardiopulmonary rehabilitation, and Sorrelle said she would make a second referral. (Pl. Decl. ¶ 40.) When Plaintiff told Sorrelle NaphCare still refused to provide him with a portable oxygen concentrator (POC) and he avoided using the large oxygen tank provided due to pain, Sorrelle advised Plaintiff to use a pulse oximeter to ensure his oxygen level did not drop below 88% when active. (*Id.*) Plaintiff has not received a pulse oximeter or cardiopulmonary rehabilitation. (*Id.* ¶ 41.)

On February 10, 2025, Plaintiff saw Shantha Kumar, MD, at Goldfield Cardiovascular Institute in Tucson "for echo[cardiogram] and cardiac clearance" because Plaintiff was contemplating spinal injections for spinal stenosis. (Doc. 36-2 at 49–50.) Dr. Kumar examined Plaintiff, assessed him with chronic thromboembolic pulmonary hypertension (CTEPH) and dizziness, noted his echocardiogram done that day showed his pulmonary artery pressure was improving, and, from a cardiac standpoint, there was no contraindication to undergoing epidural injections for spinal stenosis, but Eliquis needed to be stopped 5 days before the procedure. (*Id.* at 50.) As for the dizziness and unstable gait Plaintiff complained of, Dr. Kumar noted these symptoms may be secondary to systemic hypotension, which can be caused by Plaintiff's vasodilator medications. (*Id.*) Dr. Kumar recommended Plaintiff's blood pressure be checked the next time he is dizzy and, if it is low, Dr. Kumar encouraged Plaintiff to consume water and salt-containing fluids to keep his blood pressure up. (*Id.*)

On April 4, 2025, Plaintiff saw DNP Sorrelle at Sonoran Pulmonology to review a 2D echocardiogram, which showed his right ventricular systolic pressure had "decreased further down to 39 mmHg." (Doc. 36-6 at 2.)  Plaintiff declined a distance walk because he felt his equilibrium was off that day. (*Id*.)  Plaintiff reported he felt better while taking Adempas and Opsumit, but there had been several occasions when he ran out of the medications for 6 to 7 days. (*Id*.)  Plaintiff also reported he felt better after using supplemental oxygen at night but did not use supplemental oxygen with activity as much as he should because it hurt to drag the tank around due to his torn shoulder. (*Id*.)  Following an exam, Sorrelle diagnosed Plaintiff with chronic respiratory failure with hypoxia, pulmonary arterial hypertension, and pulmonary embolism. (*Id*. at 3.)  The plan of care for pulmonary arterial hypertension was to continue Adempas and Opsumit, to consider adding another "pathway medication in the future," and to repeat the 2D echocardiogram in 6 to 12 months. (*Id*.)  Sorrelle noted in bold: "**Extremely important p[atien]t NOT run out of medications a[s] this can cause severe rebound [p]ulmonary [hypertension] which can be fatal**." (*Id*.)  Sorrelle also wrote in bold that Plaintiff "**must continue to see Pulmonary for CTEPH as this is a subspecialty within Pulmonology which requires specialized treatment/medications and monitoring**." (*Id*.)  The plan for chronic respiratory failure with hypoxia was to continue supplemental oxygen at night, and DNP Sorrelle again recommended Plaintiff have supplemental oxygen available during the day. (*Id*.)  Sorrelle further advised Plaintiff "needs to have access to pulse oximeter to monitor his SpO2 as he needs to use supplemental oxygen when 88% or lower." (*Id*.)  The plan for pulmonary embolism was to continue taking Eliquis twice daily. (*Id*.)

On August 5, 2025, Plaintiff saw Dr. Juliya Cress, MD, at Carondelet Medical Group in Tucson to establish care for preoperative risk assessment prior to orthopedic surgery for cubital tunnel release surgery. (Doc. 65-1 at 2.)  Dr. Cress took Plaintiff's medical history, but no physical exam was recorded. (*See id*. at 2–3.)  The assessment was

pulmonary hypertension; Dr. Cress ordered an ultrasound and echocardiogram and noted Plaintiff was to return to the office as needed.[4]  (*Id.* at 2–3.)

On August 6, 2025, Plaintiff again saw DNP Sorrelle at Sonoran Pulmonology for a "follow-up to review PFT [(pulmonary function test)] and for clearance for cubital tunnel release" surgery.  (Doc. 60-3 at 9.)  Sorrelle noted Plaintiff was unable to complete the PFT because he could not exhale for 6 seconds.  (*Id.*)  Plaintiff again reported he does not use oxygen with activity as much as he should because he has a torn shoulder, and the prison will not give him a POC to use.  (*Id.*)  Sorrelle wrote that during an ambulation study, Plaintiff started at 98% on room air at rest and within 3 minutes dropped to 78% on room air but recovered up to 97% within a few seconds of sitting down.  (*Id.*)  Sorrelle again assessed Plaintiff with pulmonary arterial hypertension, chronic respiratory failure with hypoxia, and pulmonary embolism.  (Doc. 60-3 at 9–10.)  Sorrelle's treatment plan for the pulmonary arterial hypertension was to continue Adempas and Opsumit and to consider adding Prostacycline pathway medication in the future and to repeat a 2D echocardiogram no later than February 2026.  (*Id.* at 10.)  Sorrelle again noted in bold: "**Extremely important p[atien]t NOT run out of medications a[s] this can cause severe rebound [p]ulmonary [hypertension] which can be fatal**."  (*Id.*)  Sorrelle also wrote in bold that Plaintiff "**must continue to see Pulmonary for CTEPH as this is a subspecialty within Pulmonology which requires specialized treatment/medications and monitoring**."  (*Id.*)  For Plaintiff's chronic respiratory failure with hypoxia, Sorrelle's treatment plan was to continue supplemental oxygen during the night.  (*Id.*)  Sorrelle also recommended Plaintiff "have POC available during the day as his SpO2 drops to 78% on RA after only 3 minutes of activity."  (*Id.*)  She further "**[r]ecommend[ed] [an] order for oximetry monitoring while [Plaintiff is] awake and engaging in activity to determine how long SpO2 is dropping when he is active during the day**."  (*Id.*)  The treatment plan for

---

[4] Dr. Cress did not note if Plaintiff was cleared for cubital tunnel release surgery at that time or if the ultrasound and echocardiogram were needed before making that determination.

pulmonary embolism was to continue Eliquis. (*Id*.) Although Plaintiff could not complete the PFT, Sorrelle noted Plaintiff "may proceed with planned surgery from a pulmonary perspective with the following recommendation of avoiding general anesthesia, hypervolemia and maintaining SpO2 above 94% during procedure." (*Id*.)

On August 13, 2025, Corporate Nurse Practitioner Melissa Ceballos noted a request for a personal pulse oximeter was denied by the facility health administrator. (Doc. 36-28 at 2.)

On August 28, 2025, Defendant NP Alice Warren noted Plaintiff had been transported to an offsite cardiology consultation on August 5, 2025, and an offsite pulmonology consultation on August 6, 2025, and had been seen for fecal incontinence. (Doc. 36-28 at 2–3.) Regarding the pulmonology consult, Warren noted Plaintiff was to continue Adempas and Opsumit, "6 weeks to review oximetry during the day," "follow up 4–6 months no later than February 2026 for 2D echo[cardiogram]," and Plaintiff could proceed with planned surgery from a pulmonology perspective. (Doc. 36-28 at 2–3.) Regarding the request for a pulse oximeter, the record says Plaintiff was "advised Manzanita has 24 hour nursing staff available to check pulse oximeter." (*Id*. at 3.) Regarding the cardiology consult, Warren noted Plaintiff had not been "cleared for surgery" and the doctor had requested several imaging studies including an ultrasound and echocardiogram. (*Id*.) Regarding fecal incontinence, Warren noted Plaintiff reported his GI symptoms started in February 2023, his first episode of incontinence was in July 2024 before starting Tramadol, and episodes had decreased since starting Tramadol in May 2025. (*Id*.) Warren's plan of care stated "RFO Pulmonology consult - consult ordered - pulse oximetry ordered"; "RFO Cardiology consult - consult ordered"; and "Evaluation for fecal incontinence - provider note attached to Gastroenterology consult. HNR [(Health Needs Request)] as needed." (*Id*. at 4.)

### 2.   Discussion

For his pulmonary/cardiac issues, Plaintiff asks the Court to order that he be provided a POC, a pulse oximeter, cardiopulmonary rehab, and an appointment with his

treating pulmonologist. (Doc. 5-1 at 1–2.) Plaintiff asserts he suffers from shortness of breath with physical activity, dizziness, poor equilibrium, and diminished cognitive function, which he believes are related to his lung disease and NaphCare's failure to follow the pulmonologist's recommendations. (Pl. Decl. ¶ 43.)

There is no dispute Plaintiff's pulmonary/cardiac issues are "worthy of comment or treatment" as revealed by his medical records showing he has been receiving care at the prison, consultations with outside specialists, testing, medications, and supplemental oxygen for these issues. This evidence satisfies the objective prong of the deliberate indifference analysis. *See McGuckin*, 974 F.2d at 1059–60.

The subjective prong of the deliberate indifference analysis is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Jett*, 439 F.3d at 1096. Where a plaintiff seeks injunctive relief, the deliberate indifference determination is based on the defendant's current conduct. *Farmer v. Brennan*, 511 U.S. 825, 845 (1994).

The Court will review the likelihood of success on the deliberate indifference prong with respect to each of Plaintiff's requested forms of relief.

### a.    Portable Oxygen and Pulse Oximeter

As for the specialist recommendations that Plaintiff have portable oxygen available during the day and oximetry monitoring while awake, Defendants assert Plaintiff resides in a medical unit in which he has 24-hour access to oxygen and a pulse oximeter. (Doc. 36 at 5.) Defendants contend Plaintiff simply disagrees with the type of portable oxygen provided in his unit. (*Id*. at 9.)

Plaintiff presents evidence the oxygen tank provided in the medical unit is heavy and hurts his shoulder, so he does not use it as often as he should during the day. Plaintiff states he has been housed with another prisoner who was provided a portable oxygen unit called an Inogen, demonstrating precedent for receiving a POC.

The evidence reflects the pulmonologist recommended a POC on August 6, 2025, after Plaintiff told the pulmonologist he did not use the oxygen tank provided at the prison

as much as he should because he has a torn shoulder, and the prison would not give him a lighter-weight POC to use.  The pulmonologist recommended a POC be available during the day because Plaintiff's oxygen level drops to 78% after only 3 minutes of activity.  Although Defendants contend Plaintiff has oxygen available in his medical unit, there is no evidence the available oxygen is sufficient if Plaintiff is outside his unit or engaging in activity, especially since testing at the pulmonologist's office showed Plaintiff's oxygen dropped to a dangerously low level after only 3 minutes of activity.  Similarly, although a pulse oximeter may be available in the medical unit, there is no evidence that availability is sufficient, particularly when Plaintiff is outside his unit.  Accordingly, there are questions of fact as to whether Defendants have been deliberately indifferent to Plaintiff's serious medical need by failing to follow the pulmonologist's recommendations for a POC and pulse oximeter.

The Ninth Circuit and other courts have routinely found failure to follow a specialist's recommendation may amount to a medically unacceptable course of treatment.  *See Colwell*, 763 F.3d at 1069 (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (stating where the treating physician and specialist recommended surgery, a reasonable jury could conclude it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (stating defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs); *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012) (in granting a preliminary injunction for specialist treatment, district court found the prisoner plaintiff had shown a likelihood of success on the merits of her Eighth Amendment claim where the defendants failed to follow an orthopedic surgeon's strong recommendation for further

orthopedic evaluation).  In addition, a failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference under certain circumstances.  *See Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (stating "access to medical staff is meaningless unless that staff is competent and can render competent care"); *Estelle*, 429 U.S. at 104–05 & n.10 (explaining treatment received by a prisoner can be so inadequate that the treatment itself manifests deliberate indifference); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (holding prisoner does not have to prove he was completely denied medical care).

On the record before the Court, Plaintiff has shown a likelihood of success on the merits of his deliberate indifference claim regarding the treatment of his pulmonary/cardiac issues, particularly the denial of a POC and pulse oximeter.  While the record shows Plaintiff has been receiving some treatment, and oxygen and a pulse oximeter are available in the medical unit, the inference from the available evidence is that the treatment is inadequate.  A reasonable jury could find, under these circumstances, Defendants failed to competently treat Plaintiff's pulmonary/cardiac issues and acted with deliberate indifference.

In addition to showing a likelihood of success, Plaintiff must demonstrate that absent an injunction, he will be exposed to irreparable harm.  *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (stating speculative injury is not irreparable injury sufficient for a preliminary injunction); *see Winter*, 555 U.S. at 22.  To support a mandatory preliminary injunction for specific medical treatment, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury.  *See Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) (stating an injunction is only appropriate "to prevent existing or presently threatened injuries"); *Caribbean Marine*, 844 F.2d at 674.  "[T]here must be a presently existing threat of harm, although injury need not be certain to occur."  *Villanueva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008 WL 4467512, at *3 (E.D. Cal. Oct. 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–80 (9th Cir.

1  1997)).  Plaintiff has demonstrated the threat of irreparable harm where the evidence

2  reflects his oxygen level drops to 78% after only 3 minutes of activity.

3  Accordingly, the Court will grant Plaintiff's Motion for injunctive relief for a

4  portable oxygen concetrator and a pulse oximeter.

5  **b.    Cardiopulmonary Rehabilitation**

6  The record reflects Plaintiff's treating pulmonologists—Dr. Sharma and DNP

7  Sorrelle—made recommendations for cardiopulmonary rehabilitation on June 13, 2024,

8  and September 16, 2024.  Defendants assert instead of sending Plaintiff for

9  cardiopulmonary rehabilitation, NaphCare recommended an alternative treatment plan,

10  including continued medication management, education regarding diet and exercise for

11  management of symptoms, education regarding management of stress/anxiety to prevent

12  exacerbation of symptoms, and lifestyle modifications.  (Doc. 36 at 9.)  Defendants contend

13  Plaintiff's vitals have been stable, and the specialists at Plaintiff's most recent visits with

14  the cardiologist and pulmonologist on August 5 and 6, 2025, did not include additional

15  recommendations for cardiopulmonary rehabilitation.  (*Id*. at 9–10.)

16  On this record, there is a question of fact whether Defendants were deliberately

17  indifferent to Plaintiff's serious medical need when they failed to follow the treating

18  specialists' recommendations for cardiopulmonary rehabilitation.  *See Colwell*, 763 F.3d

19  at 1069; *Snow*, 681 F.3d at 988.  However, those specialists' recommendations were made

20  over a year ago and it is not clear if Plaintiff's treating specialist(s) are still recommending

21  cardiopulmonary rehabilitation or if Plaintiff is being harmed by the lack of

22  cardiopulmonary rehabilitation at this time.  Therefore, the Court will deny Plaintiff's

23  request for cardiopulmonary rehabilitation.  But if the specialist recommends

24  cardiopulmonary rehabilitation at Plaintiff's next specialist visit, and Defendants do not

25  provide the cardiopulmonary rehabilitation, Plaintiff may file a new motion for injunctive

26  relief requesting Defendants provide specialist-recommended cardiopulmonary

27  rehabilitation.

28  . . . .

### c.     Appointment with Pulmonologist

The record reflects Plaintiff's most recent pulmonology appointment was the August 6, 2025 visit with DNP Sorrelle at Sonoran Pulmonology.  At that visit, Sorrelle indicated Plaintiff was to repeat a 2D echocardiogram no later than February 2026.  On August 28, 2025, Defendant NP Warren noted Plaintiff was to follow up with pulmonology for the 2D echocardiogram no later than February 2026.  There is no evidence in the record Plaintiff was supposed to see the pulmonologist prior to February 2026, and the Court will therefore deny this request in Plaintiff's Motion.  If the follow-up appointment with the specialist does not occur by February 2026, Plaintiff may again file a request for injunctive relief to be sent to the pulmonologist.

### B.     Orthopedic/Pain/Neurological Issues

#### 1.     Relevant Facts

Plaintiff's neck and shoulder pain progressively worsened after a stay in the infirmary in June 2023, and by October 2023 he could no longer sleep without constantly waking up in excruciating pain extending from his neck down through his shoulders and causing temporary paralysis in those areas.  (Pl. Decl. ¶ 16.)  Plaintiff also had severe daily headaches and incessant pain in his cervical spine ("c-spine") during the day radiating down through his shoulders and arms.  Plaintiff's shoulders were so injured that his range of motion was severely limited and almost every movement was painful.  (*Id.*)

Plaintiff submitted HNRs asking to have his previously prescribed pain medications renewed, but when he met with Defendant NP Warren, Warren accused him of seeking pain medication to get high, opined Plaintiff was malingering, and said she would not prescribe any medication other than what Plaintiff was already receiving—Tylenol and lidocaine patches—even though Plaintiff had told her those were ineffective.  (Pl. Decl. ¶ 17.)  As a result, Plaintiff suffered severe and unnecessary pain for 5 months.  (*Id.*)

On March 26, 2024, Defendant Dr. Samina Rahman prepared an Offsite Healthcare Authorization for Plaintiff to have an "MR C-spine with and without contrast" due to "pain in neck on sleeping, radiates to both shoulders, wakes him at night, cervical spondylosis

and other abnormalities on Xray." (Doc. 36-2 at 15.)  An Offsite Consultation Note by Dr. Rahman indicates Plaintiff had an MRI—magnetic resonance imaging—of his c-spine on May 13, 2024, and the results remained pending.  (*Id.* at 16.)

On August 8, 2024, Plaintiff saw Dr. Shruti Badhwar, DO, a neurologist at Abrazo Medical Group.  Dr. Badhwar noted Plaintiff's history of pulmonary hypertension from pulmonary embolism as well as Plaintiff's complaints of multiple medical problems including dizziness, daily headaches that are not helped by over-the-counter pain medication, worsening balance, neck and lower back pain, paresthesia, pain and numbness in his hands and feet, and bowel incontinence.  (Doc. 36-5 at 2, 4; Pl. Decl. ¶ 19.)  Dr. Badhwar planned for Plaintiff to have an MRI of his brain and an MRA—magnetic resonance angiography—of his head and neck to assess his dizziness and for him to start on vestibular therapy and Meclizine as needed.  (Doc. 36-5 at 5.)  She also recommended various blood tests and occipital nerve blocks for his chronic daily headaches.  (*Id.*)  As for the chronic lower back pain, Dr. Badhwar planned for Plaintiff to have an MRI of his lumbar spine and electromyography (EMG) nerve conduction studies in his upper and lower extremities to further evaluate the paresthesia and rule out underlying peripheral neuropathy.  She also started Plaintiff on 100 mg of Gabapentin 3 times daily.  (*Id.*)  The neurologist told Plaintiff an orthopedist would need to review Plaintiff's c-spine issues and MRI results.  (Pl. Decl. ¶ 19.)

On September 17, 2024, Plaintiff saw Dr. Badhwar again, and Plaintiff told her he was still suffering from severe c-spine pain despite resuming Gabapentin, and she recommended Plaintiff consult with a pain management specialist.  (Doc. 36-2 at 28; Pl. Decl. ¶ 21.)  Dr. Badhwar assessed Plaintiff with a history of cervicogenic migraines and occipital neuralgia for which she administered an occipital nerve block to see how the migraines responded to the injection.  (Doc. 36-2 at 28.)  Dr. Badhwar recommended Plaintiff increase Gabapentin to 300 mg 3 times daily for headaches and chronic neck pain and noted she was awaiting Plaintiff's imaging studies, including an MRI of Plaintiff's brain and MRA of Plaintiff's head and neck.  (*Id.*)  Dr. Badhwar said if there was no

1    improvement in the migraines with the higher dose of Gabapentin and the occipital nerve

2    block, she would consider adding Topamax for migraine prophylaxis, and she would like

3    Plaintiff to return for a follow-up appointment in 4 weeks or sooner if needed.  (*Id.*)

4         On October 15, 2024, Plaintiff had nerve conduction studies and needle examination

5    at NeuroDiagnostic Laboratories in Tucson for his complaints of bilateral upper and lower

6    extremity pain, numbness, tingling, and weakness for the past 1.5 years.  (Doc. 36-2 at 30.)

7    Dr. Alex Hlubocky, MD, interpreted the test results, finding they "are consistent with a left

8    ulnar neuropathy at the elbow.  There is no convincing electrophysiological evidence of

9    large fiber peripheral neuropathy, left cervical/lumbosacral radiculopathy or lower

10   extremity/right upper extremity mononeuropathy."  (*Id.*)

11        On November 5, 2024, Plaintiff had several tests at St. Mary's Hospital in Tucson.

12   A lumbar spine MRI revealed: "1. Mild spinal canal stenosis at L4–L5.  Shallow left far

13   lateral protrusion approaching but not compressing the exiting left L4 nerve root.  Moderate

14   left foraminal stenosis.   2. Shallow left L3–4 foraminal protrusion without nerve

15   compression.  3. No significant spinal stenosis."  (Doc. 36-14 at 6.)  A right shoulder MRI

16   revealed: "1. Focal tear of the anterior superior through anterior glenoid labrum without

17   labral detachment.  2. Otherwise normal MRI right shoulder."  (*Id.* at 9.)  A brain MRI

18   revealed: "1. No acute intracranial abnormality.  Unremarkable unenhanced brain MRI.

19   2. Acute right frontal sinusitis."  (*Id.* at 8.)  A neck MRA and thoracic spine MRI were both

20   "unremarkable."  (Doc. 36-14 at 4, 7.)

21        On November 27, 2024, Plaintiff met with Defendant Dr. Adeyimika Omololu and

22   asked her what could be done about the tear in his shoulder and pain in his lumbar spine

23   area, and Dr. Omololu recommended physical therapy or pain management.  (Pl. Decl. ¶

24   22.)  Plaintiff told the doctor that given his severe daily pain from multiple injuries, he felt

25   pain management should precede physical therapy, and Dr. Omololu concurred, stating she

26   would submit a pain management consultation request for Plaintiff's lumbar spine and

27   shoulder followed by physical therapy.  (*Id.*)

28

On December 18, 2024, Plaintiff saw the neurologist, Dr. Badhwar, who examined him and wrote the following Assessment/Plan:

> The patient is a 44-year-old male with a history of cervicogenic migraines and occipital neuralgia. He continues to experience migraines and reports neck and lower back pain, along with paresthesias. His MRI cervical spine from May 2024 showed advanced degenerative spinal stenosis at C5–C6 with moderate right and mild left foraminal narrowing. An EMG revealed cubital tunnel syndrome on the left side, and sleep disturbances are likely related to back pain.
>
> For migraine prophylaxis, we have discussed starting Topamax (topiramate). Additionally, he is being referred to hand surgery for his cubital tunnel syndrome, to pain management for consideration of epidural injections, and to orthopedics for further evaluation of a potential labral tear. He is also advised to increase his gabapentin dose to 600mg TID.
>
> I recommend physical therapy for both his neck and back pain and suggest trying an egg crate mattress topper for improved sleep and pain relief. A follow-up appointment is scheduled in 4 weeks or sooner if needed to assess progress and adjust the care plan as appropriate.

(Doc. 36-2 at 37.)

On January 15, 2025, Defendant NP Shannon Welch noted in Plaintiff's medical record that Plaintiff was scheduled for orthopedic surgery for his right shoulder, but utilization management (UM) recommended the following conservative treatment instead: "For focal tears initial treatment is usually non-surgical conservative measures (i.e. NSAIDS, Tylenol, Ice, Brace/Sling, Physical Therapy etc.). Please initiate conservative measures including PT and make sure trials and failures are documented in the chart. If conservative treatment fails may submit new consult for reconsideration." (Doc. 36-20 at 2.)

On January 29, 2025, Plaintiff reported to a physical therapist he was feeling better after doing exercises and receiving a steroid injection on January 24, and the pain had died down to a 3. (Doc. 36-18 at 3.)

On January 30, 2025, Plaintiff was taken to a pain management clinic for a c-spine epidural injection, but the doctor said NaphCare had failed to send the necessary MRI report and had failed to take Plaintiff off Eliquis—a blood thinner—and therefore Plaintiff could not receive the epidural.  (Pl. Decl. ¶ 26.)  Plaintiff asked what else could be done for the unremitting pain and the doctor recommended an increase in Gabapentin.  (*Id*.)

At physical therapy on February 5, 2025, Plaintiff reported right shoulder pain at 4/10 when attempting to perform weight-bearing exercises; he was advised not to do those exercises until new imaging had been completed.  (Doc. 36-18 at 5.)  At physical therapy on February 19, 2025, Plaintiff reported he did not have much pain in his shoulder but pain in his neck had really been bothering him.  (*Id*. at 7.)  At physical therapy on March 5, 2025, Plaintiff reported decreased shoulder pain overall but increased cervical pain and it was "hard to determine which is which."  (*Id*. at 9.)  At physical therapy on March 11, 2025, Plaintiff reported his right shoulder felt okay but his left shoulder hurt with pain at 7/10.  (*Id*. at 12.)  At physical therapy on March 19, 2025, Plaintiff reported extreme dizziness and unsteadiness during the past week and rated his c-spine and shoulder pain at 7/10.  (*Id*. at 14.)  On April 17, 2025, Plaintiff declined further physical therapy due to poor tolerance and said he would wait until he receives a diagnosis and his condition is managed.  (*Id.* at 16.)

On March 18, 2025, Plaintiff saw an orthopedic surgeon, Dr. Christopher Luther, DO, to establish care for his left elbow pain and numbness and tingling in his fingers following an EMG performed on October 15, 2024, showing ulnar neuropathy at the elbow.  (Doc. 36-8 at 3.)  Dr. Luther assessed left cubital tunnel syndrome and recommended left cubital tunnel release surgery, which Plaintiff agreed to.  (Doc. 36-19 at 7.)

On March 28, 2025, Plaintiff saw Defendant NP Welch, who asked why Plaintiff had asked to stop shoulder PT, and Plaintiff explained PT caused severe pain in his c-spine, left arm, and upper body.  (Pl. Decl. ¶ 28.)  Plaintiff's untreated neurological symptoms of poor equilibrium, deteriorating coordination, blurred vision, and occipital neuralgia also rendered him unable to perform PT exercises.  (*Id*.)  Welch decided to stop PT and told

Plaintiff she had submitted a referral on March 27, 2025, for cubital tunnel surgery as recommended by the orthopedist. (*Id*.) Plaintiff asked if the c-spine epidural he was supposed to receive in January had been rescheduled, and she said it had not, even though Plaintiff told her the treatment had been recommended back in September 2024 and he was still experiencing incessant and severe c-spine pain. (*Id*.) Welch said there was no point in requesting further specialist referrals because they would just be denied again by UM. (*Id*.)

On May 7, 2025, Plaintiff had a chronic care visit via telemedicine with NP Megan Slattery, who noted Plaintiff had upcoming appointments scheduled for a "testicular US [(ultrasound)]" on May 8, 2025; a right shoulder MRI on May 14, 2025; pain management on May 23, 2025; left cubital tunnel release surgery on May 30, 2025; neurology on June 9, 2025; and pulmonology on August 4, 2025. (Doc. 36-9 at 1, 4, 9.)

On May 23, 2025, Plaintiff saw Dr. Vikramjeet Saini, MD, at Advanced Pain Management for a follow up regarding multiple chronic pain issues including a history of neck, shoulder, and lower back pain. (Doc. 36-3 at 2.) Plaintiff reported constant right shoulder pain for the past two years due to a tear, lower back pain, and intensely radiating neck pain. (*Id.* at 2–3.) He also reported Gabapentin helped with neuropathic pain but not nociceptive pain, and Tylenol 500 mg patches and Duloxetine were ineffective for pain management. (*Id.* at 3.) After examining Plaintiff, Dr. Saini assessed Plaintiff with cervical spondylosis and cervical radiculopathy. (*Id.* at 4.) Dr. Saini noted Plaintiff had a "complex pain presentation involving neck, shoulder, and low back pain," with associated headaches and occasional numbness and tingling in 3 fingers. (*Id.* at 6.) He also noted MRI findings "correlate[] with the patient's symptoms," and the previous treatments including oral medications and physical therapy had been ineffective. (*Id.*) Dr. Saini noted "[t]he complex nature of the pain presentation, involving multiple sites and both neuropathic and nociceptive components, necessitates a multifaceted approach to pain management." (*Id.*) Dr. Saini administered a cervical epidural steroid injection that day. (*Id.* at 5.) Dr. Saini noted the prison had denied pain management for the right shoulder

1  tear and lumbar spine issue and Dr. Saini wrote, "Consider ESI [epidural steroid injection]

2  on next visit."  (*Id*. at 6.)

3        A note by NP Slattery dated May 27, 2025, stated "ortho surgery left elbow cubital

4  tunnel release scheduled for 5/30/25 going to be cancelled . . . [and] rescheduled, pending

5  clearance needs blood work EKG chest xray etc.  [P]atient states understanding [but] is

6  frustrated because he has held his Eliquis and feels this is just another delay on medical['s]

7  part because this should have already been completed."  (Doc. 36-28 at 18–19.)

8        On June 9, 2025, Plaintiff saw neurologist Dr. Badhwar at Abrazo Brain & Spine

9  Institute.  (Doc. 36-4 at 2.)  Dr. Badhwar noted Plaintiff was an established patient with

10  ongoing neurological symptoms, muscle dysfunction, pain, and fecal incontinence.  (*Id*. at

11  4.)  Following examination, Dr. Badhwar assessed Plaintiff with cubital tunnel syndrome

12  as confirmed by EMG, cervical and lumbar spine arthritis, shoulder arthritis, chronic pain,

13  headaches, fecal incontinence, and possible fibromyalgia.  (*Id*.)  Dr. Badhwar noted surgery

14  for the cubital tunnel syndrome had been canceled by the prison's medical contractor and

15  her plan was to refer Plaintiff to an orthopedic surgeon for evaluation and possible

16  rescheduling of surgery.  (*Id*.)  For the cervical and lumbar spine arthritis, Dr. Badhwar

17  noted an MRI showed moderate spinal stenosis in Plaintiff's c-spine at C5–C6 and mild

18  spinal canal stenosis in lumbar spine at L4–L5, which may be contributing to Plaintiff's

19  pain and neurological symptoms.  (*Id*.)  Dr. Badhwar's plan was to refer Plaintiff to pain

20  management for consideration of a series of 3 epidural injections, and if those are

21  ineffective, she would then consider referring Plaintiff to a spine surgeon.  (*Id*.)  For

22  Plaintiff's chronic pain, Dr. Badhwar planned to switch Plaintiff from his current maximum

23  dose of Gabapentin 900 mg three times daily to Lyrica, starting at 50 mg twice daily and

24  increasing to 100 mg twice daily, and if that is ineffective, to refer Plaintiff to pain

25  management for further interventions.  (*Id*.)  Dr. Badhwar noted Plaintiff was currently

26  taking Topamax for chronic headaches and if the cognitive side effects were intolerable,

27  he should consider switching to Nortriptyline.  (*Id*.)  Because current imaging showed no

28  neurological explanation for Plaintiff's fecal incontinence, Dr. Badhwar recommended a

referral to gastroenterology or urology for further evaluation, and Dr. Badhwar planned to refer Plaintiff to rheumatology for possible fibromyalgia "[g]iven the widespread pain and symptoms out of proportion to imaging findings." (*Id.*) Dr. Badhwar also planned for repeat blood work for autoimmune markers and to "follow up after specialist evaluations and medication changes." (*Id.*)

A right shoulder MRI performed on July 9, 2025, revealed: "1. Scarring of the anterior superior glenoid labrum compatible with interval healing of a previously characterized tear. 2. otherwise normal MRI right shoulder." (Doc. 36-23 at 6–7.)

On July 9, 2025, NP Slattery issued an Offsite Healthcare Authorization for Plaintiff to have "cardiology clearance" prior to "pending cubital tunnel release surgery with ortho." (Doc. 36-10 at 3.) Slattery wrote: "[Plaintiff] has severe [pulmonary arterial hypertension] on opsumit and adempas yielding him high risk for surgical interventions. Defer cardiac clearance to his local established cardiologist." (*Id.*)

On August 6, 2025, Plaintiff saw an outside provider, DNP Sorrelle, for cardiac clearance to receive cubital tunnel release surgery. (Doc. 36-11 at 2.) Following an exam, Sorrelle indicated Plaintiff "may proceed with planned surgery from a pulmonary perspective with the following recommendation of avoiding general anesthesia, hypervolemia and maintaining SpO2 above 94% during procedure." (*Id.* at 3.)

### 2. Discussion

Plaintiff's Motion seeks consultations with orthopedic specialists regarding his c-spine condition and right shoulder tear, a c-spine epidural injection as recommended by a pain management specialist, cubital tunnel nerve entrapment surgery recommended by an orthopedic surgeon, and an appointment with Plaintiff's treating neurologist. (Doc. 5-1 at 1–2.)

There is no dispute Plaintiff's orthopedic and neurological issues are "worthy of comment or treatment" as revealed by his medical records showing he has been receiving care at the prison; attending consultations with outside specialists; undergoing testing and imaging; taking medications; and receiving nerve blocks, epidural injections, and physical

therapy, as well as surgical recommendations for his left ulnar nerve and shoulder.  This evidence satisfies the objective prong of the deliberate indifference analysis.  *See McGuckin*, 974 F.2d at 1059–60.  The Court will therefore turn to the subjective prong of the deliberate indifference analysis for each of Plaintiff's requests for relief.

### a.      C-Spine Consult and Epidural Injection

The record reflects Plaintiff has suffered c-spine pain since mid-2023.  On May 13, 2024, Plaintiff had a c-spine MRI, which showed advanced degenerative spinal stenosis at C5–C6 with moderate right and mild left foraminal narrowing.  In August 2024, Plaintiff saw Dr. Badhwar, a neurologist, who started Plaintiff on Gabapentin for pain and told Plaintiff he needed an orthopedist to review his MRI and c-spine issues.  In September 2024, after increased Gabapentin failed to reduce Plaintiff's c-spine pain, Dr. Badhwar recommended Plaintiff consult with a pain management specialist for his continuing severe c-spine pain.  In December 2024, Dr. Badhwar again referred Plaintiff to pain management for consideration of epidural injections and recommended physical therapy for neck and back pain, sleeping on an egg create mattress topper, and a follow-up appointment in 4 weeks or sooner to assess.  Plaintiff saw a pain management specialist on January 30, 2025, for a c-spine epidural injection but did not receive the injection because NaphCare had failed to send the MRI report and take Plaintiff off Eliquis beforehand.  Plaintiff attended PT sessions in February and March 2025 but declined further physical therapy on March 17, 2025, due to poor tolerance and severe pain in his c-spine, left arm, and upper body.  On May 23, 2025, Plaintiff saw a pain management specialist, Dr. Saini, who assessed Plaintiff with cervical spondylosis and cervical radiculopathy and administered a cervical epidural steroid injection.  When Plaintiff next saw Dr. Badhwar on June 9, 2025, he continued to complain of widespread pain, and Dr. Badhwar planned to refer Plaintiff to pain management for consideration of a series of 3 epidural injections for his cervical and lumbar spine pain, and, if those were ineffective, to consider referring Plaintiff to a spine surgeon.  Dr. Badhwar also planned to switch Plaintiff from his current maximum dose of Gabapentin to Lyrica, and, if ineffective, refer Plaintiff to pain management for further

1  interventions and rheumatology to investigate possible fibromyalgia.

2      Defendants argue when Plaintiff saw the outside neurologist in August 2024, the

3  neurologist made medication recommendations but did not indicate the need for a referral

4  to an orthopedist.  (Doc. 36 at 5.)  Defendants assert Plaintiff continued to see the

5  neurologist and has been continuously seen and treated by his NaphCare providers and

6  provided various pain medications (both injections and narcotics), as well as PT and an

7  exercise plan.  (*Id*. at 6–7.)  Plaintiff replies Defendants use selective language from his

8  August 8, 2024 neurology report to minimize his c-spine injury, even though the same

9  specialist noted the c-spine MRI showed "advanced degenerative spinal stenosis."  (Doc.

10  60-2 at 5.)  Plaintiff also notes the pain management specialist affirmed his symptoms and

11  pain were consistent with his imaging reports.

12      Based on this record, there is a question of fact whether Defendants were

13  deliberately indifferent to Plaintiff's serious medical need when they failed to follow the

14  specialists' recommendations for further c-spine epidural injections and possible referral

15  to an orthopedist or spine surgeon if pain management was ineffective.  *See Colwell*, 763

16  F.3d at 1069; *Snow*, 681 F.3d at 988.  Accordingly, the Court will grant Plaintiff's request

17  to see an orthopedist for assessment of his c-spine issues and to determine if he should have

18  any c-spine epidural steroid injections.  However, since it has been over six months since

19  the last specialist recommendation for c-spine epidural injections, and the current status of

20  Plaintiff's c-spine issues is not known, the Court will not order that Plaintiff receive a c-

21  spine injection as recommended in June 2025.  If Defendants fail to follow through with

22  the orthopedist's recommendations, Plaintiff may file a new request for injunctive relief.

23      **b.**      **Right Shoulder Tear**

24      A right shoulder MRI performed in November 2024 showed a "[f]ocal tear of the

25  anterior superior through anterior glenoid labrum without detachment."  (Doc. 36-14 at 9.)

26  In December 2024, Dr. Badhwar referred Plaintiff to orthopedics for further evaluation of

27  a potential labral tear.  In January 2025, NP Welch noted Plaintiff was scheduled for

28  orthopedic surgery for his right shoulder, but UM initially recommended conservative

treatment, including PT.  Plaintiff attended PT sessions in February and March 2025 but declined further physical therapy on March 17, 2025, due to poor tolerance.  The next week, Plaintiff told Defendant Welch PT caused severe pain in his c-spine, left arm, and upper body.

Defendants assert a possible orthopedic follow up for Plaintiff's labral tear was stayed pending conservative treatment, which is common for this type of tear, and if the conservative measures—including physical therapy and a cervical epidural steroid injection on May 23, 2025—failed, then further orthopedic follow up would be considered.  (Doc. 36 at 7.)  Defendants contend Plaintiff has acknowledged PT and injections were working, and interventions provided relief for his neck/shoulder pain, bringing his pain level down to "like a 3."  (*Id*.)  Defendants assert Plaintiff was sent to pain management on June 9, 2025, and a July 9, 2025 MRI of Plaintiff's right shoulder noted healing of the previously characterized tear and was otherwise normal.  (*Id*.)

Plaintiff replies he said in January 2025 that his neck and shoulder pain was at a 3 because he had received an injection 6 days earlier and had some initial pain relief in his shoulder, but the shot's efficacy waned over time and the shoulder pain returned.  (Doc. 60-2 at 6.)  Plaintiff asserts he was informed another steroid shot could be administered in 3 months if his shoulder pain returned, but Defendants have not provided him with another shoulder injection.  (*Id*.)  Plaintiff cites the July 9, 2025 shoulder MRI finding "[t]he subtle features of the anterior superior labral tear on previous imaging are less pronounced on the current study, probably representing some degree of interval granulation tissue formation or healing," and the provider's ultimate impression the "[s]carring of the anterior superior glenoid labrum [is] compatible with interval healing of a previously characterized tear."  (Doc. 60-5 at 2.)  Plaintiff argues Defendants have ignored his shoulder completely since physical therapy was halted in March 2025, and "[t]o this day, there remains an intense, fiery pain that flares through my sh[oulder] with certain movements.  While range of motion has improved, the movements are stilted, and I'm concerned about long term permanent damage to my sh[oulder] as a result of the Def[endant]s' handling of this

injury." (Doc. 60-2 at 6–7.) Plaintiff asserts the neurologist told him an orthopedic surgeon is the type of specialist qualified to examine his shoulder injury and make an informed decision as to the appropriate course of treatment. He further asserts no NaphCare employee has bothered to examine his shoulder for nearly a year, and Defendant Welch was a telehealth provider and UM has never seen him. (*Id*. at 6.)

Based on this record, there is a question of fact whether Defendants were deliberately indifferent to Plaintiff's right shoulder tear. Plaintiff was apparently scheduled for shoulder surgery, but it was canceled in favor of alternative treatment. Plaintiff tried the alternative treatment (PT and an injection), but the PT was too painful to continue and the injection for pain wore off and the pain returned. Plaintiff has shown present-day harm in the form of pain and limited range of motion in his right shoulder. Accordingly, the Court will grant Plaintiff's request to be seen by an orthopedist for his right shoulder injury.

### c.     Cubital Tunnel Nerve Entrapment Surgery

Nerve testing in October 2024 showed left ulnar neuropathy at Plaintiff's elbow. In December 2024, Dr. Badhwar referred Plaintiff to a hand surgeon for his cubital tunnel syndrome. On March 18, 2025, Plaintiff saw a surgeon who recommended cubital tunnel surgery. Plaintiff's left cubital tunnel release surgery was scheduled for May 30, 2025, but was canceled with a note that it would be rescheduled pending clearance. When Plaintiff saw Dr. Badhwar in June 2025, Dr. Badhwar planned to refer Plaintiff to an orthopedic surgeon for evaluation and possible rescheduling of the cubital tunnel release surgery.

Based on this record, there is a question of fact whether Defendants were deliberately indifferent to Plaintiff's serious medical need when they failed to follow the specialists' recommendations for cubital tunnel release surgery. *See Colwell*, 763 F.3d at 1069; *Snow*, 681 F.3d at 988. However, since months have passed since the last recommendation or referral was made, the Court will not order Defendants to schedule the surgery but will instead order Defendants to send Plaintiff to the appropriate specialists/surgeons to determine if surgery is still warranted. If Defendants fail to follow the specialists' recommendations, Plaintiff may file a new request for injunctive relief.

### d.     Appointment with Plaintiff's Treating Neurologist

Plaintiff's Motion seeks an order for Defendants to schedule Plaintiff to see his treating neurologist (presumably Dr. Badhwar) within 14 days. (*See* Doc. 5-1 at 2.)

The record reflects Plaintiff last saw Dr. Badhwar on June 9, 2025. At that appointment, Dr. Badhwar planned to refer Plaintiff again for cubital tunnel surgery; to refer Plaintiff to pain management for consideration of a series of 3 epidural injections for his spinal pain, and if those are ineffective, to consider referring Plaintiff to a spine surgeon; to refer Plaintiff to rheumatology for possible fibromyalgia; and to refer Plaintiff to gastroenterology or urology for fecal incontinence. Dr. Badhwar also planned to switch Plaintiff from Gabapentin to Lyrica for his chronic pain, and if that is ineffective, to send him to pain management. She also said Plaintiff could switch to Nortriptyline for chronic headaches if Topamax proved intolerable. Dr. Badhwar also planned for repeat blood work for autoimmune markers and indicated Plaintiff was to "follow up after specialist evaluations and medication changes." (*Id.*)

Based on this record, there is a question of fact whether Defendants were deliberately indifferent to Plaintiff's serious medical need when they failed to follow Dr. Badhwar's recommendations for referrals to other specialists, for repeat blood work for autoimmune markers, and for follow up with Dr. Badhwar after the specialists' evaluations and medication changes. Given that it has been over six months since Plaintiff last saw his treating neurologist, the Court will grant Plaintiff's request to be sent to see his neurologist.

### C.     GI Issues

#### 1.     Relevant Facts

In 2023, Plaintiff began experiencing GI problems with symptoms including severe abdominal pain, bloating, diarrhea, indigestion, constipation, nausea, incontinence, loss of appetite, and extreme food sensitivity. (Pl. Decl. ¶ 2.)

While hospitalized in April 2023, Plaintiff consulted with a dietician who recommended Plaintiff take a nutritional supplement such as Ensure or Boost to obtain necessary nutrients and to minimize his GI problems and pain. (Pl. Decl. ¶ 3.) When he

returned to prison, Plaintiff received the recommended Ensure from April 2023 until November 2024. (*Id.* ¶ 4.) On November 10, 2024, Plaintiff filed an HNR asking for his Ensure to be renewed, but the response said the order had expired and would not be renewed. (*Id*. ¶ 7.) After filing another HNR, Plaintiff met with Defendant NP Welch who said she could not renew Plaintiff's Ensure because a new policy precluded her from doing so. (*Id*.) NP Welch noted in Plaintiff's medical record that an order for Ensure had been discontinued on November 7, 2024, because Plaintiff no longer qualified for Ensure as his last BMI was 19.8 with a normal total protein and albumin level and he was able to eat solid foods. (Doc. 36-26 at 2.)

On August 8, 2023, Plaintiff had a GI consult and Metamucil was recommended, but NP Welch told Plaintiff Metamucil was "barred by policy as a security risk."[5] (Pl. Decl. ¶ 5.) During a November 25, 2024 GI consult, a doctor explained Plaintiff needed the medication Linzess to treat his irritable bowel syndrome with constipation (IBS-C) condition and other symptoms, given that prior treatments and medications had failed.[6] (*Id.* ¶ 8.)

On April 30, 2024, Dr. Abdul Nadir, MD, at Mountain Vista Medical Center in Mesa, Arizona, performed a colonoscopy on Plaintiff due to Plaintiff's complaints of abdominal pain in the left lower quadrant. (Doc. 36-1 at 2.) The results indicated Plaintiff's colon and rectum appeared normal. (*Id*. at 3.) Dr. Nadir recommended a repeat colonoscopy and follow up in a GI clinic. (*Id*.) Dr. Nadir also performed an upper GI endoscopy due to Plaintiff's complaints of heartburn and suspected esophageal reflux and gastro-esophageal reflux disease. (*Id*. at 4.) The results showed Plaintiff's esophagus, stomach, and first and second portions of the duodenum were normal. (*Id*. at 4–5.) The surgical pathology report of a stomach biopsy revealed "[m]ild chronic inactive gastritis

---

[5] Plaintiff does not say who recommended Metamucil or did the GI consult, and the Court did not locate a GI consult record from around this date.

[6] Plaintiff does not say who recommended Linzess or did the GI consult, and the Court did not locate a GI consult record from around this date.

and reactive gastropathy, antrum.  Oxyntic mucosa with changes suggestive of PPI effect.  Negative for H. pylori on H&E stain."  (*Id*. at 6.)

On November 25, 2024, Dr. Nadir saw Plaintiff for a follow-up visit, and Plaintiff reported continued bloating, gas, diarrhea, constipation, nausea, and heartburn.  He also reported Miralax and simethicone were not helping, but his GERD was controlled with Protonix 40 mg twice daily.  (Doc. 36-2 at 2.)  Upon examination, Dr. Nadir found Plaintiff's abdomen soft with no abdominal distension or tenderness.  (*Id*. at 3.)  Dr. Nadir's assessment was altered bowel function, abdominal bloating, functional abdominal pain, IBS-C, GERD, and "CRC screening."  (*Id*. at 4.)  Dr. Nadir's plan of care was to start Plaintiff on Buspar 5 mg three times a day before meals and Linzess 290 mg daily, continue Metamucil and 40 mg of Protonix twice daily, and to return in 6 weeks.[7]  (*Id*.)

At a December 3, 2024 appointment, Plaintiff asked Defendant NP Thornberry why Linzess had been denied despite the gastroenterologist's recommendation, and Thornberry said insurance companies often will not cover medications like Linzess due to cost,

---

[7] Buspar is the brand name for Buspirone, which "is used to treat certain anxiety disorders or to relieve the symptoms of anxiety."  Mayo Clinic, *Buspirone (oral route)*, at https://www.mayoclinic.org/drugs-supplements/buspirone-oral-route/description/drg-20062457 (permalink: https://perma.cc/2Y6E-GBL6).

Linzess is the brand name for Linaclotide and "is used to treat irritable bowel syndrome with constipation (IBS-C) and chronic idiopathic constipation (CIC).  It works by increasing intestinal fluid secretion, which helps ease the passage of stools and relieve the symptoms of constipation."  Mayo Clinic, *Linaclotide (oral route)*, at https://www.mayoclinic.org/drugs-supplements/linaclotide-oral-route/description/drg-20075770 (permalink:  https://perma.cc/HH4H-244G).

Protonix is the brand name for Pantoprazole, which "is used to treat certain conditions in which there is too much acid in the stomach.  It is used to treat erosive esophagitis or 'heartburn' caused by gastroesophageal reflux disease (GERD), a condition where the acid in the stomach washes back up into the esophagus.  This medicine may also be used to treat Zollinger-Ellison syndrome, a condition where the stomach produces too much acid."  Mayo Clinic, *Pantoprazole (oral route)*, at https://www. mayoclinic.org/drugs-supplements/pantoprazole-oral-route/description/drg-20071434 (permalink: https://perma.cc/PP8F-REJW).

implying cost was the reason Linzess was denied for Plaintiff.  (Pl. Decl. ¶ 9.)  When Plaintiff saw NP Thornberry on December 10, 2024, he told her Buspar was not providing him any relief for his painful GI symptoms, but Thornberry said Plaintiff had to continue taking Buspar to comply with "UM's ATP" (presumably, UM's alternative treatment plan) if he wanted to be approved for Linzess in the future.  (*Id.* ¶ 10.)  When Plaintiff saw Defendant Welch on December 23, 2024, Welch said she agreed wholeheartedly with the gastroenterologist that Linzess was the appropriate medication and she would fight for its approval.  (*Id.* ¶ 11.)

On December 27, 2024, NP Welch entered the following "Quick Note" in Plaintiff's medical record:

> Medical provider alert: Patient was told that he needed to try Buspirone for 30 days before Linzess would be considered.

(Doc. 60-5 at 14.)

In February 2025, NP Welch told Plaintiff his follow up with the gastroenterologist had been denied and UM had decided to go with an alternative treatment plan, which she referred to as "risk MD."  (Pl. Decl. ¶ 12.)  In March 2025, Welch told Plaintiff "risk MD" had given her a plan to prescribe Senna and Pepcid along with antibiotics for 2 weeks to treat diverticulitis.  (*Id.* ¶¶ 13, 14.)  Plaintiff later told Welch the antibiotics produced severe diarrhea and fecal incontinence, and he continued to have nausea, severe pain, and a sudden urge to use the bathroom, but he agreed to finish the course of antibiotics rather than appear noncompliant with the latest alternative treatment plan.  (*Id*. ¶ 14)

On March 10, 2025, NP Welch prepared an "eConsult Record" for gastroenterology with the following clinical question and supporting details:

> 44-year-old male patient with a medical history of GERD, Abdominal Bloating, Functional Abdominal pain, IBS-C, Diarrhea, Intermittent Fecal incontinence, Altered Bowel Function, Extensive back pain with occipital neuralgia, degeneration, left ulnar neuropathy, Primary pulmonary hypertension, Chronic thromboembolic pulmonary hypertension, long term anticoagulant therapy. Patient has been seen in the past by GI with no relief or resolution to his

> continued abdominal pain, with constipation/ diarrhea, change in appetite, and weight loss. Last GI appointment 11/2024 they recommended he start Buspar 5mg TID with meals and Linzess 290mg QD before meals along with continued Protonix 40mg BID and Metamucil.  It was suggested he follow-up 6 weeks. He was denied the Linzess and within the correctional setting no patient is allowed Metamucil.  He did try for 30 days the Buspar with no positive results subsequently we [discontinued] the medication.  He has been on every stomach medication we have access to and nothing has helped completely.

(Doc. 36-2 at 9.)  Plaintiff's medications were listed as Eliquis, Fiber-Lax, Gabapentin, Hydrocerin External, Loratadine, Multi-Vitamin, Omega 3, Opsumit, Pantoprazole Sodium, Probiotic, Simethicone, Topiramate, and Vitamin C.  (*Id*. at 10.)

On March 10, 2025, Dr. Ian Harnik, MD (board certified in internal medicine and gastroenterology), from Arista/MD responded to this eConsult:

> This sounds like a very difficult situation. He appears to have Pulm HTN (on oxygen?) and chronic pain.  However I am not given a complete history/PMH/etc from the primary provider. There is polypharmacy and it is stated that multiple drug trials have not helped him.  My tendency would be first to remove any meds that are not necessary or helpful.
>
> Adempas has several GI side effects listed; discuss with prescribing MD whether they see this and consider with the patient if symptoms started along with use of the medication.
>
> Same for Topiramate (guessing the topiramate is for headache?).  If not needed then perhaps a different neuromodulator could be tried (SSRI, TCA, remeron if not tried before) for global IBS symptoms.  There is no detail of psych history however.
>
> Consider CT abd/pelvis with oral and IV contrast given the reported weight loss in association with his abdominal complaints.
>
> Consider empiric treatment for SIBO [(small intestine bacterial overgrowth)]/IBS with xifaxan 550 TID x 14 days or if not available cipro/flagyl or other substitute.
>
> Consider low FODMAP diet or at least gluten and lactose free if possible.

Consider tapering off his PPI and getting to PRN H2RA or PRN PPI use given lack of erosive disease on EGD and chance it could cause bloating or diarrhea.

Stop probiotic and simethicone if not working.

Record suggests he is constipated without miralax but has diarrhea with it, and also a history of incontinence. Cannot get fiber and cannot get Linzess. Try to encourage high fiber diet, adequate water intake and regular toileting. Perhaps senna 1–2 tabs PRN if no BM for 2 days, or something like that. I acknowledge it may be hard to make these changes in prison.

Please reconsult with further info (past or present) and/or results of the interventions above.

(Doc. 36-2 at 11–12.)

## 2.    Discussion

Plaintiff seeks a Court order for Linzess, Metamucil, and nutritional supplements (presumably Ensure or Boost) as recommended by his treating specialists, as well as a follow-up appointment with a gastroenterologist 4 to 6 weeks after receiving the Linzess, Metamucil, and supplements. (Doc. 5-1 at 1.) Plaintiff asserts he has been compliant with NaphCare's prescribed GI treatments for two years, but he continues to suffer painful GI complications daily that negatively affect his ability to live a normal life. (Pl. Decl. ¶ 15.) Plaintiff asserts Defendants continue to deny him specialist-recommended treatments, i.e., Metamucil, Linzess, and a GI follow up, and they took away his specialist-prescribed nutritional supplement (Ensure), which had provided some GI relief. (*Id.*)

Defendants respond Plaintiff's Ensure was discontinued on November 7, 2024, because the provider determined Plaintiff's BMI was 19.8, he had a normal total protein and albumin level, and he was able to eat solid foods, which made him ineligible for Ensure. (Doc. 36 at 9.) They assert Linzess was initially denied "but only to first implement the recommended alternative treatment plan of a trial of bulk-forming laxatives such as fiber and a stimulant laxative." (*Id.* at 8.) As an alternative to Metamucil, which is prohibited by ADCRR policy, Plaintiff was prescribed Fiber-Lax (a pill) and Senna (a tablet). (*Id.* at 8–9.)

In his Reply filed November 5, 2025, Plaintiff asserts even though his GI symptoms have not abated, Defendants have not followed up with Arista/MD, and they discarded the CT scan recommendation and did not offer or discuss a FODMAP diet. (Doc. 60 at 5; Doc. 60-2 at 8.) Plaintiff further asserts Defendants' denial of Linzess in favor of an alternative treatment plan was disingenuous because other measures had been tried for over a year and failed. (Doc. 60 at 5.) Plaintiff contends that by December 2024, he met Defendants' own criteria for Linzess but they continued to deny him the medication, and Defendant Welch has told him during several appointments she agreed with the gastroenterologist's recommendations but Defendant NaphCare would not permit her to prescribe Metamucil or Linzess. (*Id*.; Doc. 60-2 at 8.) Plaintiff asserts the March 10, 2025 GI e-consult with Arista/MD was a means of further denying him Linzess and Metamucil, and even though his GI issues have continued, Defendants have repeatedly denied him an in-person follow up with Dr. Nadir. (Doc. 60-2 at 7, 8.) Plaintiff asserts his GI issues and pain have disrupted his ability to lead a normal life, without fear of food, for almost three years. (*Id*. at 8.)

There is no dispute Plaintiff's GI issues are "worthy of comment or treatment" as revealed by his medical records showing he has been receiving care at the prison, consultations with outside specialists, and medications and supplements for these issues. This evidence satisfies the objective prong of the deliberate indifference analysis. *See McGuckin*, 974 F.2d at 1059–60. The Court will therefore turn to the subjective prong.

Here, the facts do not support the denial of Ensure amounts to deliberate indifference. Although Plaintiff asserts an unnamed nutritionist recommended Ensure in April 2023, there is no medical record with this recommendation, and outside specialists Plaintiff has seen after April 2023 have not recommended Plaintiff continue taking Ensure.

There are questions, however, regarding the denial of Linzess and Metamucil as recommended by the gastroenterologist in November 2024. After that recommendation, Defendant Welch told Plaintiff ADCRR policy prohibited Metamucil and suggested NaphCare would not prescribe Linzess due to cost, even though Welch thought Linzess

was appropriate for Plaintiff.  Another gastroenterologist, Dr. Harnick, whom NaphCare consulted in March 2025, also seemed to suggest Metamucil and Linzess may be appropriate for Plaintiff, but because those are not available to Plaintiff in prison, Dr. Harnick attempted to find alternatives such as a high fiber diet and Senna.  In addition, Defendants have not cited any evidence supporting their statement Linzess was only denied initially in favor of an alternative treatment plan, suggesting Linzess may be prescribed in the future.

Based on this record, Plaintiff has shown a likelihood of success on the merits of his deliberate indifference claim regarding the treatment of his GI issues and the denial of Linzess and Metamucil.  While the record shows Plaintiff has been receiving some treatment, the evidence shows the treatment being provided at the time Plaintiff filed his Motion was inadequate.  A reasonable jury could find, in these circumstances, Defendants failed to competently treat Plaintiff's GI issues and acted with deliberate indifference.  Plaintiff has also demonstrated the threat of irreparable harm where he asserts he has suffered GI issues and pain for nearly 3 years and those issues have disrupted his ability to lead a normal life.

Accordingly, the Court will grant in part Plaintiff's Motion for injunctive relief regarding his GI issues.  However, since it has been a year since Plaintiff saw a GI specialist in person, the Court will require Defendants to return Plaintiff to the GI specialist for an in-person follow up and, if the GI specialist continues to recommend Linzess and Metamucil, Defendants must provide Linzess and Metamucil.[8]

**IT IS ORDERED**:

(1)    Plaintiff's Motion to Supplement Reply (Doc. 65) is **GRANTED**.

(2)    Plaintiff's Motion for Preliminary Injunction (Doc. 5) is **GRANTED IN PART** as follows.  Within **thirty (30) days** of the date of this Order, Defendants must:

---

[8] ADCRR's security concerns can be adequately addressed by administering the Metamucil by a prison nurse.  *See Spar v. Mohr*, No. 2:14-cv-546, 2015 WL 5895914, at *10 (S.D. Ohio Oct. 9, 2015) (recommending district court judge grant preliminary injunction for provision of Metamucil to prisoner); *see also* Doc. 100 in No. 2:14-cv-546 (adopting magistrate judge's report and recommendation).

a. Provide Plaintiff with a pulse oximeter and portable oxygen concentrator.

b. Schedule Plaintiff with an orthopedist to assess his cervical spine to determine if Plaintiff should have c-spine epidural injection(s).

c. Schedule Plaintiff with an orthopedist to assess his right shoulder injury and, if surgery is still recommended, provide the surgery.

d. Schedule Plaintiff with the appropriate specialist to determine if cubital tunnel release surgery is still recommended and, if so, provide the cubital tunnel release surgery.

e. Schedule Plaintiff to see his treating neurologist for follow up.

f. Schedule Plaintiff to see a gastroenterologist for follow up to see if Linzess and Metamucil are still recommended, and, if they are still recommended, provide Plaintiff with Linzess and Metamucil within thirty (30) days of the gastroenterologist visit.

g. Follow all the specialists' recommendations for treatment, including but not limited to testing, scans, injections, medications, surgery, treatment, medical equipment, referrals, and follow up.

h. This relief is narrowly drawn, extends no further than necessary to correct the harm, and is the least intrusive means necessary to correct the harm. *See* 18 U.S.C. § 3626(a)(2).

i. Plaintiff is not required to post bond.

(3)   Plaintiff's Motion for Preliminary Injunction (Doc. 5) is otherwise **DENIED**.

Dated this 16th day of January, 2026.


Honorable Scott H. Rash
United States District Judge

- 35 -